**Slip Op. 08-74**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS**

_____
                                         :
NUCOR CORPORATION,                       :
                                         :
                Plaintiff,               :
                                         :
        v.                               :
                                         :   Court No.
UNITED STATES,                           :   07-00070
                                         :
                Defendant,               :
                                         :
        and                              :
                                         :
CORUS GROUP PLC, AG DER DILLINGER        :
HÜTTENWERKE, SALZGITTER AG STAHL UND     :
TECHNOLOGIE, THYSSENKRUPP STEEL AG,      :
COMPANHIA SIDERÚRGICA PAULISTA,          :
USINAS SIDERÚRGICAS DE MINAS GERAIS SA,  :
and DUFERCO STEEL, INC.,                 :
                                         :
                Defendant-Intervenors.   :
_____  :


**Held:** Plaintiff's motion for judgment upon the agency record denied. The United States International Trade Commission's final determination affirmed.

Wiley Rein LLP, (Alan H. Price; Timothy C. Brightbill) for Plaintiff, Nucor Corporation.

James M. Lyons, General Counsel; Neal J. Reynolds, Assistant General Counsel, Office of the General Counsel, United States International Trade Commission (Mary J. Alves; David B. Fishberg), for Defendant, United States.

Steptoe & Johnson LLP, (Gregory S. McCue; Richard O. Cunningham; Michael A. Pass) for Defendant-Intervenor, Corus Group PLC.

DeKieffer & Horgan, (Marc E. Montalbine; J. Kevin Horgan; Merritt R. Blakeslee) for Defendant-Intervenors, AG der Dillinger Hüttenwerke, Salzgitter AG Stahl und Technologie and ThyssenKrupp Steel AG.

Vinson & Elkins LLP, (Christopher A. Dunn; Valerie S. Ellis) for Defendant-Intervenors, Companhia Siderúrgica Paulista ("COSIPA") and Usinas Siderúrgicas De Minas Gerais SA ("USIMINAS").

Dated: July 9, 2008

**OPINION**

This matter is before the Court on motion for judgment upon the agency record brought by plaintiff Nucor Corporation ("Nucor" or "Plaintiff") pursuant to USCIT Rule 56.2. Plaintiff challenges aspects of the negative final determination by the United States International Trade Commission ("Commission" or "ITC") in the five-year sunset reviews pursuant to 19 U.S.C. § 1675(c)(1)[1] concerning cut-to-length ("CTL") steel plate products from Belgium, Brazil, Finland, Germany, Mexico, Poland, Romania, Spain, Sweden, Taiwan and the United Kingdom.

---

[1]    19 U.S.C. § 1675(c)(1) provides:

> 5 years after the date of publication of . . . a countervailing duty order . . . an antidumping duty order . . . the Commission shall conduct a review to determine, in accordance with section 1675a of this title, whether revocation of the countervailing or antidumping duty order . . . would be likely to lead to continuation or recurrence of dumping or a countervailable subsidy . . . and of material injury.

**JURISDICTION**

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and (B)(iii) (2000).

**BACKGROUND**

Plaintiff Nucor challenges the Commission's negative final determination in the five-year "sunset" reviews concerning CTL steel plate products from Belgium, Brazil, Finland, Germany, Mexico, Poland, Romania, Spain, Sweden, Taiwan, and the United Kingdom.

On November 1, 2005, the Commission instituted five-year sunset reviews of the countervailing duty order and antidumping duty orders on certain carbon steel flat products from eleven subject countries. See Certain Carbon Steel Products From Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, Poland, Romania, Spain, Sweden, Taiwan, and the United Kingdom, 70 Fed. Reg. 62,324 (Oct. 31, 2005). Effective February 6, 2006, the Commission determined to conduct full reviews pursuant to section 751(c)(5) of the Tariff Act of 1930, 19 U.S.C. § 1675(c)(5). See Certain Carbon Steel Products From Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, Poland, Romania, Spain, Sweden, Taiwan, and the United Kingdom, 71 Fed. Reg. 8,874 (Feb. 21, 2006).

The final determination was issued by the Commission on

January 25, 2007 and was published in the Federal Register on January 31, 2007. See Certain Carbon Steel Products From Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, Poland, Romania, Spain, Sweden, Taiwan, and the United Kingdom, 72 Fed. Reg. 4,529 (Jan. 31, 2007). The determinations and views of the Commission are contained in Certain Carbon Steel Products From Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, Poland, Romania, Spain, Sweden, Taiwan, and the United Kingdom, Confidential Views of the Commission ("Views"), Invs. Nos. AA 1921-197 (Second Review); 701-TA-319, 320, 325-327, 348 and 350 (Second Review); and 731-TA-573, 574, 576, 578, 582-587, 612, and 614-618 (Second Review), USITC Pub. No. 3899 (Jan. 2007).

In the final determination, the Commission determined that revocation of the antidumping duty and countervailing duty orders on subject countries would not be likely to lead to continuation or recurrence of material injury to the domestic CTL plate industry. The Commission also determined to decumulate subject imports from Romania upon finding that such subject imports would likely compete in the U.S. market under different conditions of competition from other subject imports. See Views at 4. In addition, the Commission determined that the volume of cumulated subject imports from the remaining nine subject countries ("cumulated subject countries") would not be significant should the orders be revoked,

and that revocation of the orders would not result in any significant price effects and would not likely have a significant impact on the domestic industry within the reasonably foreseeable future.  See id.

Plaintiff challenges  each of these determinations arguing that they are unsupported by substantial evidence and otherwise contrary to law.[2]  See R. 56.2 Mot. And Supporting Br. Of Nucor Corp. ("Pl.'s Br.") at 4.   The Commission responds that its negative sunset determinations are supported by substantial evidence and otherwise in accordance with law and requests that the Court affirm them.  See Mem. Of Def. United States International Trade Commission In Opp'n To Pl.'s Mot. For J. On The Agency R. ("ITC Mem.") at 1.   Defendant-Intervenors' arguments are not addressed separately where they parallel those of the Commission. See Resp. Of Defendant-Intervenors Corus Group, PLC, AG der Dillinger Hüttenwerke, Salzgitter AG Stahl und Technologie and ThyssenKrupp Steel AG, In Opposition to Pl.'s Mot. For J. On the Agency R. ("German-UK Resp. Br."); Resp. Of Defendant-Intervenors Companhia Siderúrgica Paulista ("COSIPA") and Usinas Siderúrgicas De Minas Gerais SA ("USIMINAS") To Pl.'s R. 56.2 Mot. ("COSIPA & USIMINAS Resp. Br.").

---

[2]     Nucor does not object to the Commission's determination to decumulate Mexico.

**STANDARD OF REVIEW**

When reviewing ITC determinations in sunset reviews "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence is more than a mere scintilla."  Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co., 305 U.S. at 229).  In determining the existence of substantial evidence, a reviewing court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" Huaiyin, 322 F.3d at 1374 (quoting Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

**DISCUSSION**

**I. Statutory Framework**

The Commission and Commerce are required to conduct sunset reviews five years after publication of an antidumping duty or countervailing duty order or a prior sunset review.  See 19 U.S.C. § 1675(c)(1).  In a five year sunset review of an antidumping duty

or countervailing duty order, the Commission determines "whether revocation of an order . . . would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time."  19 U.S.C. § 1675a(a)(1).

In a sunset review, the Commission has discretion to cumulatively assess the volume and effect of subject imports from several countries for purposes of the material injury analysis, so long as certain threshold requirements are met.  See Nippon Steel Corp. v. United States, 494 F.3d 1371, 1374 n. 4 (Fed. Cir. 2007) (citing 19 U.S.C. § 1675a(a)(7)).  In addition, "[w]hen conducting a sunset review, the Commission is obligated to consider 'the likely volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked.'"  Nippon Steel, 494 F.3d at 1380 (quoting 19 U.S.C. § 1675a(a)(1)).

## II. Cumulation In Five Year Reviews

The Commission's statutory authority for cumulation is set out in 19 U.S.C. § 1675a(a)(7), which provides that:

> [T]he Commission may cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which reviews under section 1675(b) or (c) of this title were initiated on the same day, if such imports would be likely to compete with each other and with domestic like products in the United States market.  The Commission shall not cumulatively assess the volume and effects of imports of the subject merchandise in a case in which it determines that such imports are likely to have no discernible adverse impact on the domestic industry.  (emphasis added).

Pursuant to this statutory authority, the Commission declined

to cumulate subject imports from Romania upon finding that they are not likely to compete with other subject imports and with the domestic like product.  See Views at 43.  In refraining from cumulating subject imports from Romania, it considered the four conditions of competition:  (1) fungibility, (2) sales or offers in the same geographic markets, (3) common or similar channels of distribution, and (4) simultaneous presence.  See id. at 47.  In addition, the Commission considered "other considerations, such as similarities and differences in the likely conditions of competition of the subject imports with regard to their participation in the U.S. market for CTL plate."  Id. at 50.

With respect to the four conditions of competition, the Commission found that subject imports from these ten subject countries, Belgium, Brazil, Finland, Germany, Poland, Romania, Spain, Sweden, Taiwan and the United Kingdom,[3] would be sufficiently fungible, move in the same channels of distribution, and compete in the same geographic markets during the same periods. See id. at 47-49.  The Commission thus concluded that there would likely be a reasonable overlap of competition among subject imports and between these subject imports and the domestic like product in

_____

[3]     The ten subject countries considered here by the Commission excludes the eleventh subject country Mexico.  The Commission found that subject imports from Mexico would have no discernable adverse impact, therefore it was unnecessary for the Commission to "decide the issue of the likelihood of a reasonable overlap of competition with respect to subject imports from this country."  Views at 47.

the event of revocation.  See id. at 49.

Nevertheless, in considering other factors, the Commission went on to find that the subject imports from Romania "would likely compete under different conditions of competition than would those from the remaining nine subject countries."  Id. at 49-51.  In doing so, the Commission stated that "[t]he sole CTL plate producer in Romania [Mittal Steel Galati] is related to a major U.S. producer [Mittal Steel USA], Romania has more excess capacity than any other subject country, and it is the only subject country that is subject to tariff barriers in third-country markets."  Id. at 4.

**A.    The Commission's Decision Not To Cumulate Subject Imports From From Romania Is Supported By Substantial Evidence And In Accordance With Law**

Nucor challenges the Commission's determination to decumulate subject imports from Romania arguing that the determination is contrary to the statutory authority, and unsupported by substantial evidence and otherwise contrary to law.  Specifically, Nucor puts forth the following two bases for its position.  First, Nucor argues that the Commission's determination is inconsistent with the purpose of the cumulation statute and is contrary to the evidence of record. See Pl.'s Br. at 7.  Second, contending that "the 'four conditions of competition' examined by the Commission in its cumulation analysis fail to provide a logical basis for its determination," Nucor argues that the determination to decumulate is unsupported by substantial evidence and otherwise contrary to

law.  Id. at 12.  For the reasons set forth below, the Court finds that the Commission's determination to decumulate subject imports from Romania is supported by substantial evidence on the record.

**i.    The Commission's decision not to cumulate subject imports from Romania is not contrary to the purpose of the cumulation provision**

First, Nucor argues that "the Commission should cumulate imports from all countries that it finds:  (i) would likely have a discernable adverse impact on the U.S. industry in the event of revocation; and (ii) are likely to compete with each other and with the domestic like product."  Pl.'s Br. at 9-10.  Nucor submits that because these two statutory requirements for cumulation are met here, the Commission's determination to decumulate Romanian imports constitutes an abuse of discretion.  See id. at 10-11.

Nucor goes on to argue that while the cumulation statute provides some discretion, "[t]he Commission's discretion is . . . limited by its obligation to be cognizant of the material injury that is inflicted on the U.S. industry by the simultaneous importation of unfairly traded products from multiple countries, and Congress' purpose behind the cumulation provision, which is to redress such 'hammering effects.'"  Id. at 10.  According to Nucor, "any decision not to cumulate subject imports '[must] be predicated upon a judgment anchored in the language and spirit of the relevant statutes and regulations.'"  Id.

Nucor thus contends that the Commission erred by failing to

cumulate when the two statutory requirements were met and by failing to cumulate in light of "the congressional intent underlying the cumulation provision." Id. at 11.

According to Nucor, the two statutory requirements are met. With respect to the "discernable adverse impact," the first prong, Nucor states that although the Commission did not analyze this issue, "the 'four conditions of competition' relied on by the Commission in its cumulation analysis make it significantly more likely that subject imports from Romania would compete with other subject imports and the domestic like product in the U.S. market and that such imports would have an adverse impact on the domestic industry." Id. at 11. Nucor also cites to Romania's capacity, capacity utilization rates, excess capacity, tariff barriers in other North American markets and other operational differences between Mittal Steel USA and Mittal Steel Galati, and contend that they "all point to significant U.S. imports of Romanian plate upon revocation." Id.

Nucor contends that the second prong, the likelihood of overlap of competition, is met because the Commission acknowledged that subject imports from Romania and from other subject countries would be fungible, move in the same channels of distribution, and compete in the same geographic markets during the same periods. See id. at 11.

In support of its argument that the Commission's determination

to decumulate subject imports from Romania is contrary to the legislative intent of the cumulation provision, Nucor argues that "subject imports from Romania are likely to have exactly the deleterious 'hammering' effect on the domestic industry that Congress sought to prevent." Id. Nucor contends that, in addition to the four conditions of competition, "the data show that Romania was the single most volatile country in terms of subject imports during the period of review, demonstrating the ability to rapidly increase or decrease exports to the United States in reaction to market conditions." Id. at 11-12. Thus, Nucor states that "[i]f Romanian producers were unconstrained by antidumping orders, it is particularly evident that they would again export significant quantities of subject merchandise to the U.S. market given their prior volatility." Id. at 12.

The Commission responds that its statutory authority to cumulate subject imports is discretionary in nature, and therefore, it is not required to cumulate even upon finding (1) "a discernible adverse impact on the domestic industry" and (2) subject imports are "likely to compete with each other and with domestic like products." ITC Mem. at 12. Moreover, the Commission states that it "has wide latitude in selecting the types of factors it considers relevant" in its cumulation analysis. Id. at 13. Within such a statutory framework, the Commission contends that its determination to decumulate subject imports from Romania was "fully

consistent with the plain language of the statute and this Court's decisions." Id. In support, the Commission states that it considered Romania's capacity and capacity utilization data and "identified differences between the Romanian imports and other subject imports, such as the existence of third country barriers to trade for the Romanian products and the recent affiliation of the sole Romanian producer with a significant domestic producer." Id.

The Commission refutes Nucor's argument that the Commission's determination is contrary to the purpose of the cumulation provision (i.e., to prevent "hammering effects") by pointing to data reflecting a decrease in the volume of U.S. imports from Romania subsequent to the corporate affiliation of Mittal Steel USA and Mittal Steel Galati. See id. at 14.

"Cumulation is discretionary in five-year reviews commenced under section 1675(c), provided that the reviews are initiated on the same day and the ITC determines that the subject imports are likely to compete both with each other and the domestic like product in the United States." Allegheny Ludlum Corp. v. United States, 475 F. Supp. 2d 1370, 1375, 30 CIT __, __ (2006); Statement of Administrative Action, ("SAA") accompanying H.R. Rep. No. 103-826(I), at 887, reprinted in 1994 U.S.C.C.A.N. 4040, 4212 (Noting that "[n]ew section 752(a)(7) [1675a(a)(7)] grants the Commission discretion to engage in a cumulative analysis."). The purpose of the cumulation provision is "to stem 'competition from

unfairly traded imports from several countries simultaneously [which] often has a hammering effect on the domestic industry . . . [that] may not be adequately addressed if the impact of the imports are [sic] analyzed separately on the basis of their country of origin."  H.R. Rep. No. 100-40, part 1, at 130 (1987).

The Commission "has wide latitude in selecting the types of factors it considers relevant" in its cumulation analysis. Allegheny, 475 F. Supp. 2d at 1380, 30 CIT at __.  However, the Commission's "exercise of discretion [must] be predicated upon a judgment anchored in the language and spirit of the relevant statutes and regulations."  Id. at 1370 (quoting Freeport Minerals Co. v. United States, 776 F.2d 1029, 1032 (Fed. Cir. 1985)).

The Court agrees with the Commission's analysis and finds the Commission's determination to decumulate subject imports from Romania fully consistent with the cumulation provision and this Court's decisions.  Although the parties do not dispute that the Commission's statutory authority to cumulate is discretionary, Nucor suggests that failure to cumulate when the two statutory requirements for cumulation are met is contrary to statutory authority.  If Nucor's argument is true, then the Commission could never determine not to cumulate when the two requirements are met. Such a reading of the statute is untenable as it would be contrary to the plain language of the cumulation provision[4] and would

---

[4]    See 19 U.S.C. § 1675a(a)(7).

destroy any actual discretion of the Commission.

Moreover, the Court agrees with the Commission's finding that the two statutory requirements were not met here. Although the Commission found a reasonable overlap of competition upon analysis of the four conditions of competition, it also determined, upon consideration of other factors, that subject imports from Romania would compete under different conditions of competition.[5]

The Court is also unconvinced that the Commission's determination is contrary to the legislative intent of preventing hammering effects. Although Romania's volatility with respect to subject imports may be a relevant factor to be considered, it is insufficient to invalidate the Commission's detailed cumulation analysis supported by record evidence, including, inter alia, data reflecting a decrease in the volume of exports from Romania subsequent to the corporate affiliation of Mittal Steel USA and Mittal Steel Galati. The Court is similarly unconvinced by Nucor's hammering effects argument since the Commission majority found that

---

[5]    Specifically, the Commission found that (1) "the corporate affiliation between Mittal Steel Galati and Mittal Steel USA will make it likely that 'decisions as to how Mittal Steel Galati will respond to revocation of the antidumping duty order will be made at the corporate level with the best interest of the U.S. affiliate in mind.'"; (2) Romanian capacity data showed a different trend from that of other subject countries; (3) Romania was the only subject country facing tariff barriers in third-country markets as the basis for decumulation. Views at 50-51. As discussed in further detail in section ii infra, the Court finds these findings to be supported by substantial evidence on the record.

even if it had exercised its discretion to cumulate all subject imports, including from Romania, it still would have reached negative determinations for all eleven countries in these reviews.[6] See Views at 51 n. 255.

In sum, the Court finds that the Commission's determination to decumulate imports from Romania is not contrary to the purpose of the cumulation provision and is supported by substantial evidence.

**ii.  The Commission's subsidiary findings are supported by substantial evidence and in accordance with law**

Nucor alternatively argues that the Commission's determination to decumulate subject imports from Romania is unsupported by record evidence and challenges the following subsidiary findings:  (1) that "the corporate affiliation between Mittal Steel Galati and Mittal Steel USA will make it likely that 'decisions as to how Mittal Steel Galati will respond to revocation of the antidumping duty order will be made at the corporate level with the best interest of the U.S. affiliate in mind,'" Pl.'s Br. at 13; (2) "that capacity in subject countries declined or was flat during the period of review," id. at 16; and (3) relying on the fact that Romania was the only subject country facing tariff barriers in third-country markets as the basis for decumulation, see id. at 17.

As discussed in further detail infra, Nucor points to record

---

[6]    Moreover, the two Commissioners who cumulated imports from Romania with other subject imports still found that revocation would not likely lead to a recurrence of injury.  See Views at 93.

evidence purporting to support its positions, but the record is replete with data supporting the Commission's conclusion that subject imports from Romania would likely compete under different conditions of competition than would those from the nine cumulated subject countries. Of course, the Court may not "displace the [agency's] choice between two fairly conflicting views even though the court would justifiably have made a different choice had the matter been before it de novo." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951). As such, the Court affirms the Commission's determination.

**(a) The Commission's finding that Mittal Steel Galati's corporate affiliation with Mittal Steel USA is a condition of competition which distinguishes Romania from the other subject countries is supported by substantial evidence and in accordance with law**

With respect to Mittal Steel Galati's corporation affiliation, the Commission majority stated that:

> [t]he Romanian CTL plate industry has undergone significant changes since the original investigations and the first five-year reviews that distinguish it from the CTL plate industries in the other subject countries. Most importantly, since April 2005, the lone Romanian producer of CTL plate has been in the same corporate group as a major U.S. producer of CTL plate. During the original investigations, the Commission identified two state-owned Romanian producers of CTL plate, Sidex SA Galati and Metalexportimport. During the first reviews, there remained only one producer, Sidex. Since the first five-year reviews, Sidex was privatized and purchased in 2001 by LNM Holdings, which eventually brought the company under the control of the multinational Mittal Group of steel companies. The Romanian producer now operates under the name Mittal Steel Galati. As of April 2005, Mittal Steel Co., NV purchased the assets of U.S.

CTL plate producer International Steel Group ("ISG"), thereby creating Mittal Steel USA, which consequently is now affiliated with its Romanian sister company Mittal Steel Galati. This newly arising corporate affiliation between Mittal Steel Galati and Mittal Steel USA will make it likely that decisions as to how Mittal Steel Galati will respond to revocation of the antidumping duty order will be made at the corporate level with the best interest of the U.S. affiliate in mind. Views at 50.

Nucor contends that the Commission erred in relying on the corporate affiliation between Mittal Steel Galati and Mittal Steel USA as the basis for its finding that "decisions as to how Mittal Steel Galati will respond to revocation of the antidumping duty order will be made at the corporate level with the best interest of the U.S. affiliate in mind." Pl.'s Br. at 13. According to Nucor, Mittal is likely to sell domestically produced plates when it can do so at a profit and will import CTL plates from other Mittal mills when that is profitable despite any corporate affiliation. See id. "That Mittal owns mills in both the United States and Romania does not provide any reason for assuming that Mittal will not import CTL plate from Romania when it might be profitable to do so." Id.

In addition, Nucor states that certain differences in Mittal's U.S. and Romanian operations may allow them to avoid direct competition. See id. Nucor contends that even if Mittal imports from Romania do not compete with Mittal's domestic production, they would still compete with and injure other U.S. producers. See id. at 14. Nucor suggests that the fact that Mittal vociferously

challenged its antidumping margins at the Commerce Department to obtain a de minimis preliminary margin indicates an intention to resume a sizable import to the U.S.[7] See id. at 14.

The Commission, however, carefully considered and addressed Nucor's arguments regarding Mittal Steel Galati and Mittal Steel USA's corporate affiliation and reasonably rejected them. See Views at 88-91. The Commission states that "[t]he evidence on the record supports the argument that these corporate realignments largely explain the recent fall in the volume of subject exports from Romania during the period of review." Id. at 90. Specifically, the Commission noted that "prior to Mittal's acquisition of ISG's assets in April 2005, the volume of Romania's exports to the United States increased from 2000 to 2004. Subsequently, the volume of those exports fell . . . from 2004 to 2005, and such volumes were sharply lower . . . in interim 2006 than . . . during interim 2005."[8] Id. Thus, the Commission went

---

[7]    Mittal's participation in Commerce's administrative review cannot be interpreted as an indication of Mittal's intention to resume import to the U.S. The purpose of an administrative review is to determine the amount of antidumping duties to be assessed upon imports previously entered during the applicable period of review. See 19 U.S.C. § 1675(a)(1)(B).

[8]    Although Nucor suggests that this decline in imports is due to an increase in antidumping duty margins, see Pl.'s Br. at 13 n. 5, the margin increase that Nucor refers to occurred in February 2006, not in March 2005 as Plaintiff erroneously states, see Notice of Final Results of Antidumping Duty Administrative Review and Final Partial Rescission: Certain Cut-to-Length Carbon Steel Plate from Romania, 71 Fed. Reg. 7008 (Feb. 10, 2006). In

(continued...)

on to conclude that corporate affiliation between Mittal Steel Galati and Mittal Steel USA "makes it unlikely that Mittal Steel Galati will move aggressively to capture U.S. market share or sell its products in a manner that would have a negative effect on the prices that Mittal Steel USA receives."  Id.

The Commission also considered Nucor's argument that the differences in operations of Mittal Steel Galati and Mittal Steel USA may allow them to avoid direct competition, but still compete with and injure other U.S. producers.  See id.; Pl.'s Br. at 14. However, the Commission found credible a statement from Mittal's importing arm on this issue and found it to be consistent with the amount of subject imports from Romania in interim 2006.  See Views at 50, 90-91.  In addition, the Commission found that the fact that Mittal Steel USA manufactures a full range of CTL plate products would make it difficult for Mittal to avoid harm to its U.S. operations should it choose to import from Romania.  See id. at 91. In comparison, Nucor's position that Mittal's corporate affiliation would not restrain subject imports from Romania is merely speculative and unsupported by record evidence.

---

(...continued)
fact, the record shows that there was already a substantial decrease in imports from Romania to the United States from 2004 to 2005, well before the increase in the antidumping duty margin in 2006.  See Confidential Staff Report, Confidential Administrative R. Doc. No. 743 ("Staff Report"), CTL-IV-66.  The record also reflects a further decrease in imports from Romania to the United States from 2005 to interim 2006.  See id.

As such, the Court finds that the Commission's finding that Mittal Steel Galati's corporate affiliation is a condition of competition which distinguishes Romania from the other subject countries is supported by substantial evidence on the record.

**(b)  The Commission's findings regarding Romania's production capacity is supported by substantial evidence and in accordance with law**

Nucor next objects to the Commission's finding relating to Romania's production capacity as compared to those of other subject countries, and to Romania's level of capacity utilization. See Pl.'s Br. at 15-16.  Specifically, Nucor argues that the record contradicts the Commission's finding that production capacity is a condition of competition that distinguishes subject imports from Romania. See id. at 16.  Nucor further argues that the Commission erred by determining to decumulate subject imports from Romania based upon Romania's excess capacity data. See id.  Nucor cites to the Commission's own Staff Report to support its contention that Romania and other subject countries maintained excess capacity. According to Nucor, these findings "instead of providing support for [the Commission's] decision to decumulate, [they] actually confirm that subject imports from Romania would compete with other subject imports and cumulatively produce a 'hammering effect' on the domestic like product in the U.S. market."  Id.

As such, Nucor contends that the factors relied on by the Commission in its cumulation analysis fail to provide a logical

basis for its determination to decumulate subject imports from Romania.  See id. at 17.

Nucor's arguments lack merit.  First, the Commission's finding on Romania's production capacity as compared to that of the other subject countries is more than amply supported by record evidence as shown by a review of the relevant capacity data for the period 2000 through 2005.  The Commission determined that "this type of capacity [change] during the [period of review] was unique to the Romanian industry, and provided another indication that Romanian imports would compete under different conditions of competition than other subject imports."  ITC Mem. at 16.  The Court agrees with the Commission's analysis and finds that it is supported by substantial evidence.

Second, the Commission accounted for excess capacity of the other subject countries, but distinguished Romania based on the extent of its excess capacity.  See Views at 51.  The Commission's finding is supported by substantial record evidence.  Indeed, Nucor does not challenge the accuracy of the Commission's finding with respect to Romania's excess capacity, but contends that record evidence does not provide a logical basis for the Commission's determination to decumulate subject imports from Romania.  However, the mere fact that Nucor would have drawn the opposite conclusion based on the record evidence does not invalidate the Commission's finding when it is supported by substantial evidence on the record

as it is the case here.  See Universal Camera, 340 U.S. at 488.

**(c)   The Commission reasonably relied on the fact that Romania was the only subject country facing tariff barriers in third-country markets as a basis for decumulating subject imports from Romania**

Lastly, Nucor objects to the Commission's reliance on the fact that Romania was the only subject country facing tariff barriers in third-country markets as a basis for decumulating subject imports from Romania.  See Pl.'s Br. at 17.  Specifically, the Commission stated that "Romania is the only subject country that faces tariff barriers in third-country markets" and concluded that "[t]wo of those countries with tariff barriers in place, Mexico and Canada, limit Romania's export markets in North America."[9]  Views at 51. Nucor on the other hand draws the conclusion that these tariff barriers make it more likely to direct shipments to the U.S.  See Pl.'s Br. at 17.

Although the conclusion Nucor draws may have some merit, the Commission's conclusion is not illogical as Nucor argues.  Nucor merely draws the opposite conclusion based on the record evidence, which again is insufficient to invalidate the Commission's finding. See Universal Camera, 340 U.S. at 488.  Thus, the Court finds that

---

[9]    In addition, the Commission noted that the sole Romanian producer, Mittal Steel Galati, lacked the incentive to increase U.S. shipments because of its corporate affiliation with Mittal Steel USA and that Romanian exports were increasingly directed to the EU, a more attractive market in light of Romania's impending accession.  See Views at 91.

the Commission's finding is supported by substantial evidence on the record and in accordance with law.


   **III. Likely Volume, Price Effect, And Impact On The Industry**


**A.    The Commission's Findings Relating To Volume Of Cumulated Subject Imports Are Supported By Substantial Evidence And In Accordance With Law**

   Pursuant to 19 U.S.C. § 1675a(a)(1), the Commission must evaluate "the likely volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked." In addition, 19 U.S.C. § 1675a(a)(2) provides:

> In evaluating the likely volume of imports of the subject merchandise if the order is revoked . . . the Commission shall consider whether the likely volume of imports of the subject merchandise would be significant if the order is revoked . . . either in absolute terms or relative to production or consumption in the United States.  In so doing, the Commission shall consider all relevant economic factors, including –
>
> (A)  any likely increase in production capacity or existing unused production capacity in the exporting country,
> (B)  existing inventories of the subject merchandise, or likely increases in inventories,
> (C)  the existence of barriers to the importation of such merchandise into countries other than the United States, and
> (D)  the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products.

Put simply, the Commission must determine whether, considering the four economic factors set forth in subsections (A) through (D) of the statute, it is "likely" that the volume of imports will be "significant" if the unfair trade orders are revoked.  See id. "Thus, in accordance with the statute, in order to find sufficient volume for there to be injury, the [Commission] must identify substantial evidence from the record demonstrating that, should the orders be revoked, it is likely that the volume of the subject imports entering the U.S. market will be significant."  Nippon Steel Corp. v. United States, 391 F. Supp. 2d 1258, 1275, 29 CIT 695, 712, (2005) (citing 19 U.S.C. § 1675a(a)(2)).

In its Views, the Commission found that the volume of cumulated subject imports would not likely be significant in the event of revocation of the orders.  See Views at 5.  Plaintiff Nucor disagrees and contends that the Commission relied on the following erroneous subsidiary findings:  (1) that developments in China would not lead to increased subject imports to the U.S. market; (2) that production capacity in subject countries was insignificant, that capacity increases in the reasonably foreseeable future were unlikely to be significant and that the excess capacity of subject producers was insignificant; (3) that demand for CTL plates in Europe and other markets was projected to increase; and (4) that regional exports were not evidence of subject producers' export orientation.  See Pl.'s Br. at 19.

For the reasons set forth below, the Court finds that the Commission's findings relating to the volume of cumulated imports are supported by substantial evidence on the record and in accordance with law.

**i.    Subsidiary Findings**

**(a)    The Commission's conclusion that developments in China would not lead to increased subject imports to the U.S. market is supported by substantial evidence and in accordance with law**

Nucor objects to the Commission's conclusion that developments in China would not lead to increased subject imports to the U.S. market.    See Pl.'s Br. at 19-20.    In connection with that conclusion, the Commission found that:  (1) "producers in these subject countries do not rely on the Chinese market"; (2) there is no "evidence that China has displaced subject producers in their home or regional markets"; (3) "although there has been a large increase in Chinese production over the period of review, future increases in Chinese production and Chinese net CTL plate exports are forecast to be more moderate."  Views at 74-75.  Accordingly, the Commission concluded that the argument that "developments in China will likely lead to increased subject imports into the U.S. market are too speculative" and stated that "if a displacement effect were likely, we should already have seen it, and we have not."  Id.

With respect to these subsidiary findings, Nucor complains

that the Commission failed to consider the administrative record in its entirety, failed to explain the "overwhelming contrary evidence" in reaching its conclusion and failed to consider evidence material to Nucor's arguments. Pl.'s Br. at 20. Specifically, Nucor puts forth the following three arguments. First, Nucor contends that "the Commission's finding that 'producers in subject countries do not rely on the Chinese market' mischaracterizes [its] arguments and does not support the Commission's conclusions with respect to China." Id. Nucor explains that "China was a major market for subject producers - importing more than one million tons from subject countries in 2003," but "China's plate production exploded and the country emerged as a net exporter of plate in 2004-2005." Id. Thus, "[s]ubstantial volumes of plate from subject countries were displaced from China." Id. According to Nucor, more than 7.5 million metric tons of excess steel, including almost 2 million tons from subject countries, was forced out of China onto the global market.[10] See id. at 21. Nucor suggests that the fact that subject countries no longer rely on China as a primary export market shows that a displacement effect has already occurred in that the subject producers have already been shut out of the Chinese market as a result of China becoming a net exporter of CTL

---

[10]     Nucor states that "China went from a net import position of 4.2 million metric tons in 2003 to an annualized net export position of 3.3 million tons in 2006." Pl.'s Br. at 21.

plate.  See id.  As such, Nucor insists that the Commission's conclusion that producers in subject countries do not rely on the Chinese market is unsupported by the record evidence.

Second, Nucor asserts that the Commissions' finding that there is "no 'evidence that China has displaced subject producers in their home or regional markets' is contradicted by the overwhelming weight of the record evidence."  Id.  In support of its finding, the Commission stated that "the European Union already maintains quantitative restrictions on steel products (including CTL plate) from Russia, Ukraine, and Kazakhstan that prevent any surge in imports from those countries into the European Union."  Views at 74, n. 415.  Nucor argues that EU's quantitative restrictions only proves the importance of plate duties in the United States.  Pl.'s Br. at 21.  According to Nucor, "the overwhelming weight of evidence . . . demonstrates that China's emergence as a net exporter of plate displaced subject producers from China and resulted in increasing volumes of Chinese plate exports to subject countries and other markets."  Id.  As such, Nucor argues that "developments in China can impact subject imports . . . by encroaching on their home markets, by displacing the exports of subject producers from Asian markets, or by causing subject producers to redirect excess inventories or capacity to the U.S. market" and that "[a]ny of these supply shifts would increase the likelihood and volume of subject imports returning to the United

States upon revocation." Id. at 22.

Nucor states that "developments in China adversely impacted subject country markets such that an increase in exports to the United States would be likely upon revocation." See id. Nucor points to evidence reflecting that Chinese plate exports to subject countries increased more than 2,000 percent or roughly 1 million tons from 2003 levels, and that other subject countries in Europe faced increased competition from Chinese exports as well. See id. at 22-23. In addition, Nucor cites to record evidence reflecting that European plate prices decreased as a result of Chinese exports, and Latin America experienced adverse impacts from Chinese exports. See id. at 23-24. Moreover, Nucor notes that subject countries were preparing antidumping claims against China at the close of the record. See id. at 24. Nucor goes on to argue that "the Commission's sharp departure from its findings in the 2005 sunset review is also unjustified." See id. at 25.

Third, Nucor complains that "the Commission's contention that 'future increases in Chinese production and Chinese net CTL plate exports are forecast to be more moderate' is not only misplaced but also contradicted by the record evidence." Id. at 26. Instead, Nucor argues that the Commission should have looked at the balance between production and consumption in China in order to accurately assess Chinese oversupply and the resulting growth in volume of export. See id. Nucor contends that "China's continued production

of plate far in excess of demand was resulting in increased exports, substantial excess plate and downward price pressures in global markets." Id. Citing to certain confidential data, Nucor contends that "China continues to produce plate well in excess of demand and indicates that this trend will continue for the reasonably foreseeable future." Id. at 27.

Nucor contends that although the Commission stated in the 2005 sunset review of CTL plate that "global CTL plate capacity is likely to grow at a rapid pace relative to global consumption over the next several years, mainly due to developments in China" and noted that China's overcapacity is likely to persist for the reasonably foreseeable future, the Commission failed to consider this data in its final determination. Id. at 27-28. Nucor further contends that the Commission failed to consider additional record evidence indicating that Chinese plate exports would continue to flood European and Latin American markets. See id. at 28-29.

The Commission disagrees and states that it responded to each aspect of Nucor's arguments and provided ample evidence showing that the record did not support these claims. See ITC Mem. at 34. The Court agrees with the Commission. Indeed, the record supports the Commission's position that it thoroughly considered each of Nucor's arguments and found against them. Specifically, the Commission stated in the Views the following:

> Domestic interested parties forecast large expansions in
> global capacity, particularly in China, and project a

growing imbalance between supply and demand.  According
to record data, demand from China increased substantially
in recent years and contributed to increased prices both
globally and in the U.S. market.  At least initially,
much of the increased demand was reportedly met by CTL
plate imported into China from other sources.  As Chinese
producers  continued  to  increase  their  production
capacity, by approximately 2005, China became a net
exporter of CTL plate.  Although there has been a large
increase in Chinese production over the period of review,
future increases in Chinese production are not forecast
to be anywhere near as large, and the volume of China's
net CTL plate exports is not expected to grow much beyond
the levels seen in 2006.  Moreover, . . . record data do
not show any significant declines in prices in either the
U.S. or global markets associated with the change in
China's status from a net importer to a net exporter in
2005 or the increase in its production relative to
consumption in 2006.  Views at 63.

The Commission went on to state:

Domestic  interested  parties  assert  that  with  China's
recent transition from a net importer to a net exporter
of CTL plate, subject imports will be displaced from the
Chinese market and from their own home and third-country
markets. [They] assert that, as a result, there will
likely be increased subject imports into the U.S. market
in the event of revocation.  In contrast to the producers
in the cumulated countries involved in the 2005 CTL plate
review, . . . producers in these subject countries do not
rely on the Chinese market.  Nor is there evidence that
China has displaced subject producers in their home or
regional markets.  Instead, record data indicates that
subject producers have recently shipped larger volumes to
their home and regional markets.  Moreover, although
there has been a large increase in Chinese production
over the period of review, future increases in Chinese
production and Chinese net CTL plate exports are forecast
to be more moderate.  In sum, if a displacement effect
were likely, we should already have seen it, and we have
not.  Therefore, we do not expect a displacement effect
in the reasonably foreseeable future.  Id. at 74-75
(footnotes omitted).

    The Court is satisfied with the Commission's analysis and its

explanation.  Moreover, the Court finds no merit to Nucor's first

argument that the Commission's conclusion that producers in subject countries do not rely on the Chinese market is unsupported by the record evidence.  Indeed, the Commission specifically addressed Nucor's argument and acknowledged that "demand from China increased substantially in recent years and contributed to increased prices both globally and in the U.S. market" based on arguments raised in Nucor's Posthearing Brief.  Views at 63.  The Commission then noted that "in 2005, the percentage of total shipments to China by subject producers were low or non-existent."  Views at 74, n. 414.

As noted by Defendant-Intervenors COSIPA and USIMINAS, most subject countries exported commercially insignificant quantities of CTL plate to China between 2004 and 2006, constituting less than 1 percent of the roughly 7 million ton market for CTL plate in the U.S.  See COSIPA & USIMINAS Resp. Br. at 13.  In the aggregate, subject countries constituted only 15.8 percent of total CTL plate exports to China in the first half of 2006.  See id.  Indeed, COSIPA notes that even the Plaintiff recognized that Europe and Latin America rather than China constitute the primary export markets for the vast majority of subject producers.  See COSIPA & USIMINAS Resp. Br. at 13; Pl.'s Br. at 34.  Thus, the Court finds that the record is replete with evidence supporting the Commission's finding that the subject countries do not rely on the Chinese market.

Nucor's second argument that the Commission ignored record

evidence in finding no evidence that China has displaced subject producers in their home or regional markets is also simply incorrect. Again, the Commission specifically discussed this issue and found that "subject producers have recently shipped larger volumes to their home and regional markets." Views at 74. Indeed, the record reflects that Belgian, Finnish, German, Polish, and U.K. subject producers had higher home market shipments in interim 2006 than in interim 2005, and that Brazilian, Polish, Taiwan, and U.K. subject producers had higher regional shipments in interim 2006 than in interim 2005. See Staff Report, Tables CTL-IV-9, -14, -19, -25, -37, -49, -51, -53, and -58.

Although Nucor contends that the EU's quantitative restrictions only proves the importance of plate duties in the United States, the Commission reasonably observed that those restrictions would prevent any surge in imports from those countries into the European Union. See Views at 74, n. 415.

Nucor's argument that the Commission failed to consider its finding relating to China's overcapacity made in the 2005 sunset review similarly lacks merit. The Commission sufficiently addressed and explained that "[i]n contrast to the producers in the cumulated countries involved in the 2005 CTL plate reviews, which the Commission found relied on the Chinese market (except for Italy), producers in these subject countries do not rely on the Chinese market." Views at 74. The Commission also noted that

"[i]mports from the subject countries in the 2005 reviews (except for France) surged in volume in the period leading up to the orders; subject producers continued to ship into the U.S. market; subject producers increased production capacity over the period of review; and subject producers were subject to antidumping duties in third-country markets." Views at 74, n. 412. The Court is thus satisfied with the Commission's explanation and finds it reasonable.

The Court is also unconvinced by Nucor's third argument that the record evidence contradicts the Commission's finding that "future increases in Chinese production and Chinese net CTL plate exports are forecast to be more moderate." Indeed, the record reflects that the Commission relied on the same data that Nucor claims the Commission ignored. See Views at 63 n. 337 (stating that Chinese production increased [a certain number of] percent between 2000 and 2006 but was projected to increase only [a smaller number of] percent between 2006 and 2008). Moreover, the Court finds that the Commission did in fact analyze China's production and consumption to determine the extent of its oversupply. See Views at 63, n. 334 (stating that China's production was projected to exceed its consumption by [a certain number of] metric tons in 2006, compared to an excess ranging from [a certain number] to [a certain number of] metric tons annually between 2007 and 2010); Nucor's Posthearing Brief, Confidential Administrative R. Doc. No.

636 ("Nucor's Posthearing Brief"), Ex. 2.

In short, the Court finds no merit to all three arguments posed by Nucor with respect to the Commission's findings relating to the "China effect" and finds that the Commission's findings are supported by substantial evidence on the record and in accordance with law.

**(b)  The Commission's findings regarding subject countries' capacity trends are supported by substantial evidence and in accordance with law**

With respect to production capacity in subject countries, the Commission found that "[t]here have been significant declines in production capacity in many of the subject countries since the original investigations, including for each of the countries with relatively larger capacities at the time of the original investigations" and that the record did not reflect any likely significant increases in production capacity in the subject countries in the reasonably foreseeable future. Views at 67.  The Commission also found that excess capacity of subject producers in 2005was "considerably smaller than the 1.1 million short tons of excess capacity that existed among the eleven subject countries in the first reviews." Id. at 68-69.

Nucor complains that the Commission erred (1) in finding that production capacity declined in many of the subject countries, see Pl.'s Br. at 30-33, (2) in finding that there would be no significant increases in production capacity in the reasonably

foreseeable future, see id. at 31-32, and (3) by grossly underestimating excess capacity of subject producers, see id. at 34-36.

The Commission erred, according to Nucor, by "ignor[ing] the wealth of record evidence documenting the substantial existing capacity . . . in both subject and non-subject countries." Id. at 30. Nucor contends that "in seven out of 10 subject countries, production capacity actually increased from the original investigation to 2005" and that "[i]n the eleventh subject country . . . production capacity increased from 1999 to 2005." Id.

Nucor next contends that the Commission erred by relying solely on questionnaire data with respect to its findings on production capacity and excess capacity of subject producers.[11] See id. at 35-36. According to Nucor, respondent data were incomplete and inadequate because fewer than half of the subject producers responded to the questionnaire.[12] See id. at 31, 35-36. Instead, Nucor argues that the Commission should have relied upon a certain capacity data on the record which is more comprehensive. Had the Commission relied upon that data, Nucor contends that it would have

_____

[11]     With respect to the Commission's finding on excess capacity of subject countries, Nucor argues that "the Commission erred by excluding Romanian imports from consideration" because it "impermissibly failed to cumulate subject imports from Romania with other subject imports." Pl.'s Br. at 36.

[12]     Nucor contends that the Commission's "reliance on the capacity data provided by respondents alone constitutes reversible error." Pl.'s Br. at 31.

found that (1) production capacity increased in the subject countries, see id. at 31, and (2) subject countries had a significant excess capacity, see id. at 36.

Nucor also complains that the "evidence . . . refutes the Commission's assertion that there would be no significant increases in production capacity in the foreseeable future." Id. at 31.  In support of its argument, Nucor cites to record evidence relating to Romania, Mexico[13] and Brazil.[14]  See id. at 31-32.

In addition, Nucor contends that the Commission failed to consider or address other projected production increases in certain subject countries, which according to Nucor, provide a more accurate indication of likely levels of exports to the U.S. market than capacity.  See id. at 32.  In short, Nucor contends that "capacity and or production increases were expected in nine of the 11 subject countries in the reasonably foreseeable future."  Id.

Lastly, Nucor argues that the Commission failed to "consider

_____

    [13]    Nucor's argument based on Romania and Mexico, the two countries that the Commission determined to decumulate, do not merit a detailed discussion since capacity data from non-cumulated countries are irrelevant in analyzing production capacities of cumulated subject countries.  See 19 U.S.C. § 1675a(a)(2)(A) (requiring the Commission to consider likely increases in production capacity in the subject exporting country).

    [14]    With respect to Brazil's production capacity, Nucor supports its argument by pointing to confidential capacity data which it claims to be more comprehensive.  See Pl.'s Br. at 32. Nucor complains that the Commission failed to address this data. However, the Court finds that the Commission properly relied on questionnaire data as discussed infra.

the substantial record evidence documenting the massive new plate capacity expansions expected around the globe in the reasonably foreseeable future." Id.

The Commission responds that it correctly found that the "combined production capacity of the nine subject countries has declined substantially since the original investigations." Views at 67.

According to the Commission, to the extent available, it reasonably relied on capacity data that was directly submitted by the subject producers that conformed to the scope of the reviews and that accounted for the vast majority of production in the subject countries. See ITC Mem. at 25-26. Indeed, the Commission notes that most of the companies that did not respond to the questionnaire were not producers of subject merchandise.[15] See id. at 26. The Commission further explained that the data which Nucor contends the Commission should have relied upon were understated in some respects and overstated in other respects. See id. at 27 (quoting Views at 56-57).

The Court agrees and is satisfied with the Commission's

---

[15]    The Commission states that foreign producer questionnaires covered 100 percent of subject production for four of the nine countries cumulated by the Commission. For three of the remaining five countries, the Commission's questionnaires covered the large majority of production in those countries. For the remaining two countries, the Commission did not have questionnaire responses but relied on the data provided by Nucor as the best indication of those countries' capacity levels. See ITC Mem. at 25-26.

explanation for using questionnaire responses and finds the explanation reasonable because those responses correspond directly to the scope of the reviews. The use of data which Nucor contends the Commission should have relied upon, which do not directly correspond to the scope of the reviews, was also appropriate in instances where the subject countries' questionnaire responses were insufficient or absent. See 19 U.S.C. § 1677e(a).

The Court also finds that the Commission's findings with respect to production capacity and capacity increases are supported by substantial evidence. The Commission reasonably relied upon respondent questionnaire data and correctly found significant declines in production capacity in many of the subject countries since the original investigations. See ITC Mem. at 27; Staff Report, Tables CTL-IV-8, -13, -18, -24, -25, -30, -36, -42, -48, -50, -52, -57; Views at 67 n. 363. Nucor's argument that producers in some countries experienced increases in capacity does not invalidate the Commission's finding.

With respect to Nucor's argument that the Commission should have analyzed production increases which provide a more accurate indication of likely levels of exports to the U.S. market than capacity, the Court agrees with the Commission's response that the statute directs it to consider production capacity rather than production increases. See ITC Mem. at 29; 19 U.S.C. § 1675a(a)(2)(A). In any event, even if Nucor's argument that

production increases provide a more accurate indication of likely levels of exports to the U.S. market than capacity increases is correct, the Court is satisfied with the Commission's finding, which included an analysis of production increases.[16]

Moreover, the Commission specifically recognized that the available excess capacity is not insubstantial in relation to the U.S. market, but found it unlikely "that such volumes would be shipped to the United States if the finding and orders were revoked." Views at 68. In doing so, the Commission provided a detailed explanation of subject producers' high capacity utilization, strong demand and focus on their home and regional markets. The Court finds the Commission's explanation reasonable and supported by substantial evidence on the record.

(c)  **The Commission's findings regarding demand conditions in the U.S. and global markets are supported by substantial evidence and in accordance with law**

In its volume analysis, the Commission considered demand conditions in the U.S. and global markets for the reasonably foreseeable future. See Views at 71-72. The Commission found that projections for "plate consumption outside of the North American market . . . show continuing increases through 2010" and that

---

[16]     The Commission states that "because the questionnaires asked foreign producers to report 'any changes in the character of [their] operations relating to the production of [CTL plate] . . . any production increases due to improved efficiency should have been captured in the responses along with new capacity additions." ITC Mem. at 29.

"demand is also expected to continue to be strong in the regional markets that subject producers currently serve" including Europe and Latin America.  Views at 72-73.

Nucor argues that the certain data contained in the Commission's Staff Report does not support the Commission's finding that demand for plate in Europe and other global markets was projected to increase in the reasonably foreseeable future.  See Pl.'s Br. at 33-34.  In support of its argument, Nucor relies on a certain independent data contained in its Prehearing Brief.  See Nucor's Prehearing Br., Confidential Administrative R. Doc. No. 561 ("Nucor's Prehearing Br."), Ex. 4, Table S.1; Ex. 7.

The Commission responds that its finding is supported by substantial evidence and points out that instead of the Commission's data in its Staff Report, Nucor cites to data that includes broader "steel plate" industry data.  According to the Commission, it correctly relied upon more narrowly tailored data which shows an overall upward trend in demand.  ITC Mem. at 33. The Court agrees with the Commission and finds reasonable that it relied upon more narrowly tailored data.  Furthermore, the Commission's conclusion is supported by substantial record evidence.  As noted by the German-UK Respondents,[17] even the data cited in Plaintiff's brief support the Commission's finding.  See

---

[17]    German-UK Respondents are Corus Group, PLC, AG der Dillinger Hüttenwerke, Salzgitter AG Stahl und Technologie and ThyssenKrupp Steel AG.

German-UK Resp. Br. at 18-28.

In sum, record evidence, particularly the data that Plaintiff itself cites, refutes Plaintiff's arguments, and supports the Commission's findings.

**(d)  The Commission's findings regarding regional exports as evidence of subject producers' export orientation are supported by substantial evidence and in accordance with law**

The Commission examined the level and composition of exports from the nine cumulated subject countries to markets other than the United States and found that for seven subject countries for which there was information on total shipments, "their exports . . . represented [a small] percent of total shipments because an important share of their shipments were consumed internally and/or sold in their home market." Views at 70.  The Commission went on to state that "a substantial majority of these export shipments were to markets in the subject producers' own geographic regions." Id.  Thus, the Commission concluded that "we do not consider subject producers' within-region exports to indicate that increased exports to the United States are likely if the finding and orders under review are revoked." Id. at 71.

Nucor argues that "the Commission erred by considering these 'within-region' exports to be equivalent of home market exports" because "[t]he statute does not permit such an analysis." Pl.'s Br. at 37.  Citing to 19 U.S.C. § 1677(3), Nucor submits that the

Commission is not permitted to consider a customs union, such as the European Union, as a country for the purpose of antidumping proceedings.  See id. at 37.   Moreover, Nucor contends that "barriers to trade and customs formalities within the EU still exist," and therefore, "the premise that producers are free from internal barriers to trade with the EU is simply not correct."  Id. at 37.  Nucor goes on to conclude that "shipments outside a subject producer's home country, even if within the EU or Mercosur, must be considered evidence of the export-orientation of that producer." Id.  In support of its position, Nucor points to record evidence relating to the subject countries' export data.  See id. at 38.  In addition, Nucor states that the Commission failed to consider data indicating that subject countries exported a substantial volume of subject merchandise outside their region.  See id.

The Court finds no merit to Nucor's arguments.  First, the Commission did not consider regional exports to be home market sales as Nucor claims.  They were explicitly considered exports.[18]

Second, although Nucor points out that barriers to trade and customs formalities within the EU still exist, that fact alone does not invalidate the Commission's finding that "subject producers have a significant incentive to continue to ship to markets that are in relatively close proximity to them, and in the case of the

---

[18]    In its determination, the Commission referred to within-region exports as "export shipments," as distinguished from "shipments . . . consumed internally and/or sold in their home market."  Views at 70.

European Union and Mercosur, that provide some logistical and

tariff advantages."   Views at 71.   The Commission throughly

explained its reasoning as follows:

> Given the geographic proximity of subject producers and
> purchasers in regional markets, transportation costs are
> generally lower than they would be in the case of
> shipments from those producers to the United States.  For
> these reasons and others, foreign producers, including
> Mittal, produce according to a model in which production
> facilities largely serve the regional markets in which
> they are located.  Moreover, having invested efforts in
> cultivating customers within regional markets (customers
> with whom foreign producers may expect to enjoy certain
> natural advantages (such as those mentioned above)),
> foreign producers are not likely to abandon those
> existing regional customers in favor of more speculative
> and short-lived prospects with customers in the United
> States.  Id.

Although Nucor relies on export data for subject countries to

support its argument, the Commission reasonably found based on

record evidence that only a small portion of the subject countries'

total shipments were exported to markets outside their local

regions.   Thus, the Commission's conclusion, that subject

producers' within-region exports did not indicate that increased

exports to the U.S. were likely upon revocation, is reasonable and

is supported by substantial evidence on the record.  See Views at

71, 73, nn. 387-89.[19]

_____

[19]     The Court is similarly unconvinced by Nucor's argument
that the Commission failed to consider data indicating that
subject countries exported a substantial volume of subject
merchandise outside their region.  The Court finds that the
record evidence amply supports the Commission's finding that for
seven subject countries for which there was information on total
shipments, "their exports . . . represented [a small] percent of

(continued...)

**B.   The Commission's Finding That Cumulated Subject Imports Would Not Likely Have Significant Price Effects Is Supported By Substantial Evidence And In Accordance With Law**

With respect to the Commission's finding that cumulated subject imports would not likely have significant price effects,[20] Nucor puts forth the following arguments.  First, Nucor argues that the Commission's determination that revocation of the order would not result in any significant adverse price effects is not supported by substantial evidence and is contrary to law.  See Pl.'s Br. at 38.  According to Nucor, the Commission relied upon its erroneous findings regarding the likely volume of subject imports, which was unsupported by the evidence.  See id.

Second, Nucor complains that, in assessing price effects of subject imports from Romania, the Commission noted that the

---

(...continued)
total shipments" and that "a substantial majority of these export shipments were to markets in the subject producers' own geographic regions."  Views at 70.

[20]    The statute provides that:

In evaluating the likely price effects of imports of the subject merchandise if the order is revoked or the suspended investigation is terminated, the Commission shall consider whether -
(A) there is likely to be significant price underselling by imports of the subject merchandise as compared to domestic like products, and
(B) imports of the subject merchandise are likely to enter the United States at prices that otherwise would have a significant depressing or suppressing effect on the price of domestic like products.  19 U.S.C. § 1675a(a)(3).

percentage of underselling increased from the original investigation to the current review, and that the margins of underselling also remained significant during the period of review. See id. at 38-39. Notwithstanding this underselling, the Commission found that prices for all five pricing products have more than doubled since 2000. See Views at 77-78. Thus, the Commission found it unlikely that the additional volumes of subject imports from Romania will lead to significant price declines. See id. at 80.

Nucor objects to the Commission's analysis on the ground that the level of pricing is irrelevant to an underselling analysis to the extent that a certain price level has no bearing on whether imports will undersell the domestic product. See Pl.'s Br. at 39. Indeed, Nucor claims that higher pricing means that underselling will result in proportionally greater price declines. See id. Nucor thus argues that the Commission's determination with respect to the price effects of subject imports from Romania is not supported by substantial evidence and otherwise contrary to law.

With respect to Nucor's first argument, the Court finds that the Commission reasonably and correctly relied on its volume findings, which were based on substantial record evidence and otherwise consistent with law. The Commission reasonably found that the cumulated imports would not be likely to significantly undersell the domestic like product or significantly depress or

suppress domestic prices upon revocation.  See Views at 76-80.  As noted by the Commission, the record evidence reflects that "growing demand in U.S. and global markets enabled domestic producers to double or nearly double prices to historic highs during the [period of review], with the largest price increases occurring during 2004, even though there was a contemporaneous increase in the volume of total imports."  ITC Mem. at 77-79.  Moreover, "[t]he spread between costs and net unit sales prices grew as domestic producers issued successive price increases that more than offset their growing costs, and demand projections were rosy."  See id.

Second, the Court finds no merit to Nucor's argument with respect to subject products from Romania that higher pricing means that underselling will result in proportionally greater price declines.  The statute requires that the Commission evaluate the likely price effects of imports and whether there is likely to be significant price underselling.  See 19 U.S.C. § 1675a(a)(3).  The Commission found underselling, but also found that prices continued to increase and that domestic producers have passed on surcharges and increased base prices even in the face of increasing imports in 2004 and 2005.  See Views at 92.  Thus, the Commission's conclusion that revocation of the order would not lead to adverse price effects despite finding underselling is not illogical as Nucor suggests.  Rather, the Commission properly analyzed whether there would be significant price effects pursuant to the statutory

requirements.

**C.    The Commission's Finding That Cumulated Subject Imports Would Not Likely Have A Significant Impact On The Domestic Industry Is Supported By Substantial Evidence And In Accordance With Law**

Lastly, Nucor disagrees with the Commission's determination that revocation was not likely to have a significant impact on the domestic industry.  See Pl.'s Br. at 40.  Nucor contends that the determination is not supported by substantial evidence and is contrary to law because the Commission's analysis was based on its erroneous findings regarding likely volume and price effects as discussed above.  See id.

As the Court already found supra, the Commission's findings regarding volume and price effects are supported by substantial evidence on the record.  Moreover, the Commission provided a thorough and detailed explanation to support its conclusion.  The Commission stated with respect to the first sunset review that it "found the domestic industry to be in a weakened state, due at least in part to the effects of the dumped and subsidized imports from non-subject countries that were put under order during the period of review."  Views at 81.  In the current proceedings, the Commission stated that "[w]e find that the domestic industry is not currently vulnerable.  Since the beginning of the period of review, the domestic industry, through closures, bankruptcies,

consolidation, and expansion, has been significantly restructured and has emerged from this period stronger and fundamentally changed." Id. It went on to state that "[m]ost industry performance indicators improved dramatically during the current period of review," id. at 81, and that "[t]he conditions that have enabled the industry to become profitable since 2004 are not likely to change in the reasonably foreseeable future," id. at 84. The Commission thus concluded that because the domestic industry is in a healthy rather than vulnerable condition, revocation of the orders on subject imports would not likely have a significant adverse impact on the domestic industry within the reasonably foreseeable future. See id. at 85. Thus, the Court finds that the Commission's conclusion is supported by substantial evidence on the record and in accordance with law.

## CONCLUSION

In accordance with the foregoing, the Court affirms the ITC's final determination. Plaintiff's motion for judgment upon the agency record is denied.

/s/ Nicholas Tsoucalas
**NICHOLAS TSOUCALAS**
**SENIOR JUDGE**

Dated:     July 9, 2008
           New York, New York