**Slip Op. 09-16**

# UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS**

_____
                                        :
NUCOR CORPORATION,                      :
                                        :
              Plaintiff,                :    Public
                                        :    Version
              and                       :
                                        :
UNITED STATES STEEL CORPORATION, AK     :    Consol.
STEEL CORPORATION,                      :    Court No.:
                                        :    07-00454
              Plaintiff-Intervenors,    :
                                        :
              v.                        :
                                        :
UNITED STATES,                          :
                                        :
              Defendant.                :
_____ :


**Held**: Plaintiff and Plaintiff-Intervenors' motions for judgment upon the agency record is granted in part and denied in part. The United States International Trade Commission's final determination is remanded for redetermination consistent with this opinion.


    Wiley Rein LLP, (Daniel B. Pickard) for Plaintiff, Nucor Corporation.

    Skadden Arps Slate Meagher & Flom, LLP, (James C. Hecht; John J. Mangan; Robert E. Lighthizer; Stephen P. Vaughn) for Plaintiff-Intervenor, United States Steel Corporation.

    King & Spalding, LLP, (Joseph W. Dorn; Elizabeth E. Duall; Jeffrey M. Telep) for Plaintiff-Intervenor, AK Steel Corporation.

    James M. Lyons, General Counsel; Andrea C. Casson, Assistant General Counsel, Office of the General Counsel, United States International Trade Commission (Robin L. Turner), for Defendant, United States.


                    Dated: March 9, 2009

**OPINION**

This matter is before the Court on motions for judgment upon the agency record brought by plaintiff Nucor Corporation ("Nucor"), plaintiff-intervenor, AK Steel Corporation ("AKS"), and plaintiff-intervenor United States Steel Corporation ("USS") (collectively, "Plaintiffs" or "Domestic Producers"), pursuant to USCIT Rule 56.2. Plaintiffs challenge the negative determinations by the United States International Trade Commission ("Commission" or "ITC") in the five-year sunset reviews pursuant to 19 U.S.C. § 1675(c)(1)[1] of the countervailing duty order on hot-rolled steel products from South Africa and revocation of the antidumping duty orders on hot-rolled steel products from Kazakhstan, Romania, and South Africa.

**JURISDICTION**

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and (B)(iii) (2000).

---

[1]     19 U.S.C. § 1675(c)(1) provides:

5 years after the date of publication of . . . a countervailing duty order . . . an antidumping duty order . . . the Commission shall conduct a review to determine, in accordance with section 1675a of this title, whether revocation of the countervailing or antidumping duty order . . . would be likely to lead to continuation or recurrence of dumping or a countervailable subsidy . . . and of material injury.

## BACKGROUND

In August and November 2001, the Commission determined that an industry in the United States was materially injured by reason of subsidized imports of hot-rolled steel products from Argentina, India, Indonesia, South Africa, and Thailand, and by reason of less than fair value imports from hot-rolled steel products from Argentina, China, India, Indonesia, Kazakhstan, Netherlands, Romania, South Africa, Taiwan, Thailand, and Ukraine. See Hot Rolled Steel Products From Argentina and South Africa, Inv. Nos. 701-TA-404 and 731-TA-898 and 905 (Final), USITC Pub. 3446 (Aug. 2001) (PR 65); Hot Rolled Steel Products From China, India, Indonesia, Kazakhstan, The Netherlands, Romania, South Africa, Taiwan, Thailand, and Ukraine, Inv. Nos. 701-TA-405-408 and 731-TA-899-904 and 906-908 (Final), USITC Pub. 3468 (Nov. 2001) (PR 66) (collectively, "Original Determinations").[2]  During the period September through December 2001, the United States Department of Commerce ("Commerce") published countervailing duty ("CVD") orders on Argentina, India, Indonesia, South Africa, and Thailand, and antidumping duty ("AD") orders on Argentina, China, India, Indonesia, Kazakhstan, Netherlands, Romania, South Africa, Taiwan, Thailand, and Ukraine.  See Hot-Rolled Steel Products From Argentina, China, India, Indonesia, Kazakhstan, Romania, South

---

[2]     Hereinafter all documents in the confidential record will be designated "CR" and all documents in the public record designated "PR."

Africa, Taiwan, Thailand, and Ukraine, USITC Pub. 3956, Inv. Nos. 701-TA-404-408 and 731-TA-898-902 and 904-908, at I-2 (review) (Oct. 2007)(PR 453).

On August 1, 2006, the Commission instituted five-year reviews of the orders on hot-rolled steel products from Argentina, China, India, Indonesia, Kazakhstan, Netherlands, Romania, South Africa, Taiwan, Thailand, and Ukraine ("subject countries"). See 71 Fed. Reg. 43,521-23 (August 1, 2006) (PR 3).

The final determinations were issued by the Commission on October 25, 2007 and were published in the Federal Register on October 31, 2007. See Hot Rolled Steel Products From Argentina, China, India, Indonesia, Kazakhstan, Romania, South Africa, Taiwan, Thailand, and Ukraine, 72 Fed. Reg. 61,676 (Oct. 31, 2007) (PR 441). The determinations and views of the Commission are contained in Hot-Rolled Steel Products From Argentina, China, India, Indonesia, Kazakhstan, Romania, South Africa, Taiwan, Thailand, and Ukraine ("Final Determination" or "Views"), USITC Pub. 3956, Inv. Nos. 701-TA-404-408 and 731-TA-898-902 and 904-908 (review) (Oct. 2007)(PR 453)(CR 427).

In the Final Determination, the Commission determined, inter alia, that revocation of the orders against China, India, Indonesia, Taiwan, Thailand, and Ukraine would be likely to lead to the continuation or recurrence of material injury to the domestic

industry within a reasonably foreseeable time.[3]  See Views at 3 (PR 453).  With respect to the orders against Argentina, Kazakhstan, Romania, and South Africa, the Commission determined that their revocation would not be likely to lead to the continuation or recurrence of material injury to the domestic industry within a reasonably foreseeable time.  See id.

In the instant consolidated appeal, each Plaintiff challenges aspects of the ITC's negative determinations for Kazakhstan, Romania, and South Africa.[4]  See Pl.'s R. 56.2 Mot. Summ. J. Agency R. ("Nucor's Mem."); Mem. Supp. Mot. J. Agency R. AKS ("AKS's Mem."); Mem. Supp. Mot. J. Agency Rule 56.2 USS ("USS's Mem."). The Commission responds that its negative sunset determinations are supported by substantial evidence and otherwise in accordance with law, and requests that the Court affirm them.  See Mem. Def. ITC

---

[3]    In its final results in the five-year review concerning the AD order on hot-rolled steel from the Netherlands, Commerce revoked the order effective November 29, 2006.  See Certain Hot-Rolled Carbon Steel Flat Products from the Netherlands; Final Results of the Sunset Review of Antidumping Duty Order and Revocation of the Order, 72 Fed. Reg. 35,220 (June 27, 2007). Accordingly, the Commission terminated its five-year review of hot-rolled steel from the Netherlands effective June 27, 2007, and any imports from the Netherlands were considered nonsubject imports for these determinations.  See Hot-Rolled Steel Products From the Netherlands, 72 Fed. Reg. 40,322 (July 24, 2007).

[4]    On November 28, 2007, Nucor and U.S. Steel filed separate appeals to the United States Court of International Trade ("CIT"), which were assigned case nos. 07-00454 and 07-00461, respectively.  On November 30, 2007, AKS filed its appeal to the CIT under case no. 07-00463.  On March 14, 2008, appeals brought by U.S. Steel and AKS were consolidated with this action.

Opp'n Pls.' Mot. J. Agency R. ("ITC Mem.").

**STANDARD OF REVIEW**

When reviewing ITC determinations in sunset reviews "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is more than a mere scintilla." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co., 305 U.S. at 229). In determining the existence of substantial evidence, a reviewing court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" Huaiyin, 322 F.3d at 1374 (quoting Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

**DISCUSSION**

**I. Statutory Framework**

The Commission and Commerce are required to conduct sunset reviews five years after publication of an antidumping duty or

countervailing duty order or a prior sunset review.  See 19 U.S.C.

§ 1675(c)(1).  In a five-year sunset review of an antidumping duty

or countervailing duty order, the Commission determines "whether

revocation of an order . . . would be likely to lead to

continuation or recurrence of material injury within a reasonably

foreseeable time."  19 U.S.C. § 1675a(a)(1).

In making its determination, the ITC must "consider the likely

volume, price effect, and impact of imports of the subject

merchandise on the [domestic] industry if the order is revoked."

Id.  Specifically, it must take into account:

> (A) its prior injury determinations, including the
> volume, price effect, and impact of imports of the
> subject merchandise on the industry before the order was
> issued . . . ,
> (B) whether any improvement in the state of the industry
> is related to the order . . . ,
> (C) whether the industry is vulnerable to material
> injury if the order is revoked . . . , and
> (D) in an antidumping proceeding under section 1675(c)
> of this title, the findings of the administering
> authority regarding duty absorption under section
> 1675(a)(4) of this title.

Id.


## II. Cumulation In Five-Year Reviews


In a sunset review, the Commission has discretion to

cumulatively assess the volume and effect of subject imports from

several countries for purposes of the material injury analysis, so

long as certain threshold requirements are met.[5]  See 19 U.S.C. §

1675a(a)(7); Statement of Administrative Action ("SAA")

accompanying H.R. Rep. No. 103-826(II), at 887, reprinted in 1994

U.S.C.C.A.N. 4040, 4212 (noting that the "[n]ew section 752(a)(7)

[1675a(a)(7)] grants the Commission discretion to engage in a

cumulative analysis.").  Those threshold requirements are that:

(1) the five-year reviews commenced under section 1675(c) are

initiated on the same day,[6] (2) the subject imports to be cumulated

would be likely to compete with each other and with domestic like

products in the United States market ("reasonable overlap of

competition prong"); and (3) the Commission has not determined that

the subject imports to be cumulated are likely to have no

discernible adverse impact on the domestic industry ("no

---

[5]     The Commission's statutory authority for cumulation in
sunset reviews is set out in 19 U.S.C. § 1675a(a)(7), which
provides that:

> [T]he Commission may cumulatively assess the volume and
> effect of imports of the subject merchandise from all
> countries with respect to which reviews under section
> 1675(b) or (c) of this title were initiated on the same
> day, if such imports would be likely to compete with each
> other and with domestic like products in the United
> States market.  The Commission shall not cumulatively
> assess the volume and effects of imports of the subject
> merchandise in a case in which it determines that such
> imports are likely to have no discernible adverse impact
> on the domestic industry.

[6]     There is no dispute that this statutory requirement is
satisfied here because all reviews were initiated on the same day
– August 1, 2006.  See Views at 11 (PR 453).

discernible adverse impact prong").[7]  See 19 U.S.C. § 1675a(a)(7);
Allegheny Ludlum Corp. v. United States, 30 CIT 1995, 1998-99, 475
F. Supp. 2d 1370, 1375 (2006).

    Pursuant to this statutory authority, the Commission
determined to cumulate subject imports from Kazakhstan, Romania,
and South Africa ("Mittal Countries") with each other, and to
separately cumulate subject imports from China, India, Indonesia,
Taiwan, Thailand, and Ukraine ("Other Cumulated Countries") with
each other.[8]  See Views at 20 (PR 453).  In so doing, the
Commission made the following subsidiary findings:  (1) the no
discernible adverse impact exception to cumulation does not apply
to the subject countries with the exception of Argentina; (2) there
would likely be a reasonable overlap of competition between subject
imports from each country and the domestic like product as well as
among subject imports from each country;[9] and (3) based on the

---

    [7]    "'No statutory provision enumerates the factors to be
considered by the ITC in making the discernible adverse impact
determination.  In the absence of specific statutory guidance,
the ITC "'generally considers the likely volume of the subject
imports and the likely impact of those imports on the domestic
industry within a reasonably foreseeable time if the orders are
revoked.'"  Cogne Acciai Speciali S.P.A. v. United States, 29 CIT
1168, 1173 (2005) (citation omitted).

    [8]    The Commission also found that subject imports from
Argentina are ineligible for cumulation on the ground that they
were likely to have no discernible adverse impact on the domestic
industry in the event of revocation.  See Views at 20 (PR 453).

    [9]    The ITC considers the following four factors to assess
whether subject imports are likely to have a reasonable

(continued...)

existence of unique conditions of competition, subject imports from the Mittal Countries would not be likely to compete under similar conditions of competition with the subject imports from the Other Cumulated Countries.  See id.

Plaintiffs do not challenge the first two subsidiary findings, but dispute the third subsidiary finding relating to the Commission's conditions of competition analysis.  Their challenges generally fall into the following three categories.[10]  First, they contend that the Commission's conditions of competition analysis is inconsistent with the purpose of the cumulation provision.  Second, they object to the analytical framework employed by two of the Commissioners who declined to cumulate subject imports from the Mittal Countries with subject imports from the Other Cumulated Countries.  Third, Plaintiffs argue that the Commission's cumulation determination is not supported by substantial evidence on the record.  For the reasons set forth below, the Court finds that the Commission's cumulation decision is supported by

---

(...continued)
competitive overlap with the domestic like product:  "(1) the degree of fungibility between products; (2) the presence of sales or offers to sell in the same geographic markets; (3) the existence of common or similar channels of distribution; and (4) the simultaneous presence of imports in the market."  Wieland Werke, AG v. United States, 13 CIT 561, 563, 718 F. Supp. 50, 52 (1989).

[10]    Where each Plaintiff makes substantially similar arguments, the Court will not address each Plaintiff's argument separately.

substantial evidence and in accordance with law.

## A.    Conditions of Competition Analysis

### 1.    Plaintiffs' arguments

Plaintiffs challenge the Commission's cumulation decision on the ground that the Commission's determination to separately cumulate subject imports from the Mittal Countries from the Other Cumulated Countries is inconsistent with the purpose of the cumulation statute. See AKS's Mem. at 12-18; Nucor's Mem. at 8-14; USS's Mem. at 8-11. Specifically, Plaintiffs complain that even though the Commission found that the statutory factors for cumulation were met such that (1) subject imports are not likely to have no discernible adverse impact on the domestic industry in the event of revocation of the orders, and (2) these subject imports are likely to compete with each other and with the domestic like product, the Commission nevertheless determined to separately cumulate subject imports from the Mittal Countries from those of the Other Cumulated Countries. See AKS's Mem. at 19; Nucor's Mem. at 9-10; USS's Mem. at 8. In so doing, Plaintiffs contend that the Commission ignored the purpose of the cumulation provision, which is to prevent the "hammering effect" of unfair imports from multiple sources. See AKS's Mem. at 14; Nucor's Mem. at 13; USS's Mem. at 10-11.

Although Plaintiffs acknowledge that the Commission may exercise discretion in its cumulation decision, they contend that

its decision must be informed by the statutory text and legislative history. See AKS's Mem. at 13-14; Nucor's Mem. at 13; USS's Mem. at 11. Because the Commission failed to consider the "hammering effect" of subject merchandise from the Mittal Countries on the domestic industry in its conditions of competition analysis, Plaintiffs argue that the Commission's cumulation decision is contrary to law. See AKS's Mem. at 15-21; Nucor' Mem. at 13-14; USS's Mem. at 11.

### 2. ITC's response

The ITC responds that the statute does not direct the Commission to consider any particular factors when exercising its discretion to cumulate, and that this Court has recognized the Commission's wide latitude in selecting the types of factors to consider. See ITC's Mem. at 11-12. The Commission disagrees with Plaintiffs' argument that ITC's cumulation analysis is contrary to the purpose of cumulation because it fails to account for the possible "hammering effect." See id. at 12. While acknowledging that Plaintiffs correctly state the purpose of cumulation, the Commission argues that no statutory language or legislative history mandates the Commission to consider "hammering effect" as an independent factor to be considered. See id. at 12-13. The Commission states that its cumulation decision represents a reasoned exercise of its statutory discretion. See id. at 13-14.

**B.    Chairman Pearson and Commissioner Okun's Analytical Framework**

In the <u>Views</u>, Chairman Pearson and Commissioner Okun employed

a different analytical framework in their cumulation analysis than

the other Commissioners.  These Commissioners state that:

> while they consider the same issues discussed in this
> section in determining whether to exercise their
> discretion to cumulate the subject imports, their
> analytical framework begins with whether imports from the
> subject countries are likely to face similar conditions
> of competition.  For those subject imports which are
> likely to compete under similar conditions of
> competition, they next proceed to consider whether those
> imports are likely to compete with each other and with
> the domestic like product.  Finally, if based on the
> analysis they intend to exercise their discretion to
> cumulate one or more subject countries, they analyze
> whether they are precluded from cumulating such imports
> because the imports from one or more subject countries,
> assessed individually, are likely to have no discernible
> adverse impact on the domestic industry.

<u>Views</u> at 10, n. 36 (PR 453).

**1.    Plaintiffs' argument**

Plaintiffs contend that using their analytical framework,

Chairman Pearson and Commissioner Okun did not consider the

statutory factors because they, in the first step, reached the

decision that subject imports from the Mittal Countries were not

likely to face similar conditions of competition as the subject

imports from the Other Cumulated Countries.  <u>See</u> AKS's Mem. at 28-

30; Nucor's Mem. at 15-16; USS's Mem. at 11-13.   These

Commissioners' analysis, Plaintiffs argue, contravenes the statute

which requires the Commission to conduct a no discernible adverse impact analysis and to consider whether subject imports are likely to compete with each other and with the domestic like product. See id.

### 2.    ITC's response

The ITC responds that these Commissioners considered all statutory factors, but considered them in a different order from the other Commissioners. See ITC's Mem. at 14. In support, the ITC points to its Views, in which it states that Commissioners Pearson and Okun both "consider[ed] the same issues discussed in this section in determining whether to exercise their discretion to cumulate the subject imports." Views at 10 n.36 (PR 453). Noting that the statute does not mandate a particular order for the ITC to consider the statutory factors, the Commission contends its cumulation analysis is consistent with the statute. See ITC's Mem. at 14-15.

### C.    Substantial Evidence

### 1.    Plaintiffs' arguments

Plaintiffs challenge the Commission's cumulation decision on an alternative ground that it is unsupported by record evidence. See AKS's Mem. at 21-28; Nucor's Mem. at 17-21; USS's Mem. at 13-19. They note that the Commission primarily relies on one main fact, the corporate affiliation amongst Mittal USA, Mittal Temirtau, Mittal Galati, and Mittal SA, in concluding that the

ArcelorMittal Group companies will likely compete in the U.S. hot-rolled steel market in a different manner than the industries in any of the other subject countries. See AKS's Mem. at 21-22; Nucor's Mem. at 17; USS's Mem. at 13-14.

Specifically, Plaintiffs point to the Commission's reliance on the testimony of an ArcelorMittal executive who stated that the marketing or commercial organization in the United States has to consent to imports from foreign affiliates. See AKS's Mem. at 21-22; Nucor's Mem. at 17-18; USS's Mem. at 16. Plaintiffs argue that the testimony upon which the Commission relies and the remaining record evidence do not demonstrate that Mittal USA would have any incentive or authority to withhold such consent in order to protect the domestic manufacturing interests at the cost of the company as a whole. See AKS's Mem. at 22; Nucor's Mem. at 18; USS's Mem. at 16. Thus, USS notes that Mittal USA's veto power, even if true, "does not show that [imports from the Mittal Countries] will not contribute to the combined hammering effect of subject imports." USS's Mem. at 16.

Indeed, Plaintiffs contend that the Commission ignored the fact that ArcelorMittal's aim is to maximize its total profits and the rate of return of its shareholders, not necessarily those of each individual facility or in each individual country. See AKS's Mem. at 22; Nucor's Mem. at 18-19; USS's Mem. at 16-17. As such, Plaintiffs argue that if ArcelorMittal can produce and sell steel

more profitably in Kazakhstan, Romania, or South Africa than in the United States, it will do so. See Nucor's Mem. at 18-19; USS's Mem. at 17. Plaintiffs also complain that the Commission ignored the fact that subject imports from the Mittal Countries will likely harm the U.S. industry as a whole even if ArcelorMittal may not intend to harm its own U.S. operations. See AKS's Mem. at 22-23; Nucor's Mem. at 20.

### 2. ITC's responses

Defendant contends that Plaintiffs' arguments are flawed because they focus on the ultimate inquiry of whether subject imports will harm the domestic industry and not the discretionary cumulation decision. See ITC's Mem. at 16. The ITC retorts that Plaintiffs ignore the most pertinent factual finding at issue – the fact that Mittal USA's relationship with affiliated producers in the Mittal Countries did not exist for producers in any of the other subject countries. See id. at 16-17.

The Commission elaborates that it relied upon the corporate affiliation of the ArcelorMittal companies, evidence that ArcelorMittal operates a unified sales network to manage sales in territories where the Group is not a producer, and the testimony of an ArcelorMittal executive regarding Mittal USA's veto power over whether imports from a sister foreign facility enter the U.S. market. See id. at 17-19. In addition, the Commission cites to several CIT cases wherein the Court affirmed the Commission's

determination to not cumulate based on corporate affiliation.  See id. at 19-20.

## D.   Analysis

### 1.   The ITC's conditions of competition analysis is supported by substantial evidence and is not contrary to law

As previously noted, the Commission's no discernible adverse impact or reasonable overlap of competition findings are not challenged here.   At issue is whether the Commission's determination to separately cumulate subject imports from the Mittal Countries based on its "conditions of competition" analysis is supported by substantial evidence and in accordance with law.

The cumulation provision is unambiguous.  Cumulation in sunset reviews is discretionary.   The cumulation provision does not require the Commission to consider any particular factors, see 19 U.S.C. 1675a(a)(7), and the Commission "has wide latitude in selecting the types of factors it considers relevant" in its cumulation analysis, Allegheny, 30 CIT at 2005, 475 F. Supp. 2d at 1380.   Indeed, even before the enactment of the Trade and Tariff Act of 1984, which introduced the statutory basis for cumulation, the Commission had substantial discretion in determining whether to cumulate volume and effects of imports.  See Lone Star Steel Co. v. United States, 10 CIT 731, 734, 650 F. Supp. 183, 186 (1986).  The prior law permitted cumulation "'where the conditions of trade so warrant[ed].'"  Wieland-Werke AG v. United States, 31 CIT __, __, 525 F. Supp. 2d 1353, 1363-64 (2007)(quoting USX Corp. v. United

States, 11 CIT 82, 87, 655 F. Supp. 487, 491 (1987).

"[D]iscretionary cumulation does not preclude the Commission from considering any factor it considers relevant." Allegheny, 30 CIT at 2007, 475 F. Supp. 2d at 1378. Based on the statutory directive to the ITC to consider whether subject goods would compete with each other upon revocation of the order, this "Court has repeatedly allowed the ITC to consider many factors related to difference in the likely post-revocation conditions of competition." U.S. Steel Corp. v. United States, Slip Op. 08-82 at 7 (Aug. 5, 2008).

Nevertheless, the Commission's discretion is not unfettered and the Commission's "exercise of discretion [must] be predicated upon a judgment anchored in the language and spirit of the relevant statutes and regulations." Allegheny, 30 CIT at 1999, 475 F. Supp. 2d at 1376 (quoting Freeport Minerals Co. v. United States, 776 F.2d 1029, 1032 (Fed. Cir. 1985)). The purpose of cumulation is to stem "competition from unfairly traded imports from several countries simultaneously [which] often has a hammering effect on the domestic industry . . . [that] may not be adequately addressed if the impact of the imports are [sic] analyzed separately on the basis of their country of origin." H.R. Rep. No. 100-40, part 1, at 130 (1987).

In its cumulation analysis, the Commission did not find that hot-rolled steel from the subject countries, with the exception of

Argentina, is likely to have no discernible adverse impact on the domestic industry. In addition, the Commission found likelihood of a reasonable overlap of competition between imports of hot-rolled steel from each subject country and the domestic like product, and among subject hot-rolled steel imports from each subject country. Nevertheless, based on its "conditions of competition" analysis, the Commission concluded that subject imports from the Mittal Countries "will likely result in the ArcelorMittal Group companies competing in the U.S. hot-rolled steel market in a different manner than the industries in any of the other subject countries."[11] Views at 18 (PR 453).

Plaintiffs contend that the Commission's conditions of competition analysis is contrary to law because it ignores the purpose of the cumulation provision. When analyzing a non-statutory factor, such as the conditions of competition, Plaintiffs contend that the Commission must consider the "hammering effect" of unfair imports from the subject countries. The Court disagrees.

---

[11]     "Mittal USA, was created from the acquisition/consolidation of the assets of various former steel companies, including Acme Steel, LTV, Bethlehem Steel, Ispat Inland, and Weirton Steel. Mittal Steel Co., NV was formed in 2005, as the result of a merger between Ispat International and LMN Holdings. In 2006, Mittal Steel Co. NV announced its merger with Arcelor SA, creating a new entity ArcelorMittal; the legal completion of the merger between Mittal and Arcelor is expected by the end of 2007." Views at 17, n.88 (PR 453) (citation to CR/PR omitted). The Court will refer to this newly formed entity as Mittal Steel Co., NV, Arcelor S.A., and ArcelorMittal interchangeably.

Nothing in the statutory language requires the Commission to specifically consider the "hammering effect" of unfairly-traded imports from multiple sources on the domestic industry in its cumulation analysis as a separate factor. If Congress had intended the Commission to consider "hammering effect" as an independent factor in its discretionary cumulation analysis, it would have done so. It did not as evidenced by the statutory language and the legislative history. Although there is no doubt that the purpose of the cumulation provision is to prevent the "hammering effect," Congress gave the Commission wide discretion in the types of factors to consider. Therefore, the fact that the Commission did not separately consider the "hammering effect" does not invalidate its conditions of competition analysis. In addition, Plaintiffs have not demonstrated that the Commission's conditions of competition analysis is contrary to the purpose of cumulation such that it fails to account for the "hammering effect."[12]

Moreover, the Commission's cumulation determination, including its conditions of competition analysis, is supported by substantial evidence. The Commission relied on the testimony of an executive

---

[12]      Plaintiffs AKS and USS seem to rely on the record evidence regarding likely volume of imports from the Mittal Countries as conclusive evidence of the "hammering effect." See AKS's Mem. at 15-18; USS's Mem. at 16-19. However, basing the cumulation decision solely on the likely volume of imports without further justification may constitute an impermissible circular analysis that relies on the same factors for refusal to cumulate as for an ultimate negative injury determination. See Allegheny, 30 CIT at 2002-03, 475 F. Supp. 2d at 1378-79.

of ArcelorMittal as to the way it operates a unified sales network to "manage[] sales in territories where the Group is not a producer" meaning that Mittal USA essentially has a "veto power" over whether imports from a sister foreign facility enter the U.S. market.  Views at 17-18 (PR 453); see Transcript of Commission Hearing on Hot-Rolled Steel Products, Inv. Nos. 701-TA-404-408 and 731-TA-898-908 (review)(July 31, 2007 and August 1, 2007)("Tr."), at 218-19 (PR 253) (stating that the marketing or commercial organization in the United States has to consent to imports from foreign affiliates).  The Commission further supported its cumulation decision with evidence that Mittal Temirtau, Mittal Galati, and Mittal Steel SA, respectively, account for virtually all production of subject merchandise in Kazakhstan, Romania, and South Africa.  See Views at 17 (PR 453).  In addition, the Commission considered that Mittal USA is the largest domestic producer of hot-rolled steel with six hot-rolled steel facilities that account for a substantial share of domestic hot-rolled steel production in 2006.[13]

---

[13]    The Court does not address whether corporate affiliation should not be the sole basis upon which to determine whether to cumulatively assess subject countries because that is not what the Commission has done here.  As discussed, the Commission adequately supported its cumulation decision and its conditions of competition analysis with other compelling facts that support its theory that the subject imports from the Mittal Countries will likely compete in a different manner than the producers from the Other Cumulated Countries.  Cf. Nucor Corp. v. United States, Slip Op. 08-74 at 15, n.5 (July 9, 2008)

(continued...)

Based on the evidence, the Commission reasonably concluded that there is no similar relationship between any combination of U.S. producers and subject producers that control all or virtually all production in any of the remaining subject countries, and that subject hot-rolled steel industries in Kazakhstan, Romania, and South Africa will likely result in the ArcelorMittal Group companies competing in the domestic market in a different manner than the industries in any of the other subject countries.

Although Plaintiffs complain that the testimony of the ArcelorMittal executive upon which the Commission relied is self-serving, it is within the purview of the Commission to determine the weight to be assigned to the evidence it evaluates. See U.S. Steel Group v. United States, 96 F.3d 1352, 1357 (Fed. Cir. 1996). So long as the Commission's choice of evidentiary weight has adequate basis, the Court must defer to the Commission. See Nippon Steel Corp. v. United States, 458 F.3d 1345, 1359 (2006). Here, the Commission chose to give weight to the testimony of an ArcelorMittal executive as to ArcelorMittal's own operation of its sales network and Mittal USA's veto power, and reasonably concluded that subject imports from the Mittal Countries would compete under

(...continued)
(cumulation decision based on corporate affiliation, different trend in capacity data, and tariff barriers in third-country markets); U.S. Steel Corp., Slip Op. 08-82 at 7, n.6 (cumulation decision based on corporation affiliation as well as the differences in the product mixes and the relative importance of home market sales).

different conditions of competition than those from the Other Cumulated Countries.[14]

### 2. Chairman Pearson and Commissioner Okun's analytical framework is not contrary to law

The Court finds no merit to Plaintiffs' argument that Chairman Pearson and Commissioner Okun's analytical framework is contrary to law. Plaintiffs contend that Chairman Pearson and Commissioner Okun did not consider the statutory factors because they, in the first step, reached the decision that subject imports from the Mittal Countries were not likely to face similar conditions of competition as the subject imports from the Other Cumulated Countries. Plaintiffs argue that "the statute <u>requires</u> the Commissioners to consider whether imports compete with one another and the domestic like product, and further <u>requires</u> them to determine whether imports from individual countries are likely to have no discernible adverse impact on the domestic industry." USS's Mem. at 12.

---

[14] Plaintiffs also argue that: (1) ArcelorMittal's aim is to maximize its total profits rather than those of each individual facility or country and that if ArcelorMittal can produce and sell steel more profitably in Kazakhstan, Romania, or South Africa than in the United States, it will do so; and (2) the Commission ignored the fact that subject imports from the Mittal Countries will likely harm the U.S. industry as a whole even if ArcelorMittal may not intend to harm its own U.S. operations. The Court finds that these arguments are substantively related to the Commission's volume determination rather than the cumulation decision as discussed in further detail in section III below.

At the outset, the Court notes that the identical analytical framework has been previously met with approval by the Court of International Trade.   See, e.g., Nucor Corp. v. United States ("Nucor-CoRe Steel"), Slip Op. 08-141 (Dec. 23, 2008); U.S. Steel, Slip Op. 08-82 at 5-6, n.4.  Certain plaintiffs in Nucor-CoRe Steel raised substantially similar challenges as Plaintiffs do in the instant matter.[15]  The court in that case found that "[s]tripped bare, [plaintiffs] argument is that Chairman Pearson and Commissioner Okun chose to conduct their cumulation analysis in a different order than [the other Commissioners]."  Nucor-CoRe Steel, Slip Op. 08-141 at 40.  Likewise, the Court disagrees with Plaintiffs' reading of Chairman Pearson and Commissioner Okun's cumulation analysis in the instant matter.  The Commission's Views unequivocally state that "Chairman Pearson and Commissioner Okun . . . consider[ed] the same issues discussed in this section," which

---

[15]     In support of its argument, Plaintiffs USS and Nucor cite Angus Chemical Co. v. United States, 140 F.3d 1478, 1485 (Fed. Cir. 1998), wherein the United States Court of Appeals for the Federal Circuit held that the Commission must consider all the statutory factors of volume, price, and impact in its injury test.  See Nucor's Mem. at 15-16; USS's Mem. at 12-13.  AKS cites to Massachusetts v. EPA, 549 U.S. 497 (2007), for the proposition that an agency must exercise its discretion in conformance with the authorizing statute.  Both cases were cited for the same proposition in the Nucor-CoRe Steel case, and the Court rejected plaintiffs' arguments.  The Nucor-CoRe Steel court distinguished Angus on the ground that it involved a different statutory provision with different statutory language.  Massachusetts was rejected on the ground that the statute at issue, the Clean Air Act, does not accord the same wide discretion with which Congress imbued the Commission.  This Court similarly rejects both authorities on the same grounds.

includes the analysis of both statutory factors.  <u>Views</u> at 10 n.36 (PR 453).

Individual Commissioners "are not required to apply identical analytical methodologies."  <u>See</u> <u>Nucor-CoRe Steel</u>, Slip Op. 08-141 at 42 (citing <u>U.S. Steel</u>, 96 F.3d at 1362 (stating that "[s]o long as the Commission's analysis does not violate any statute and is not otherwise arbitrary and capricious, the Commission may perform its duties in the way it believes most suitable.")).  Moreover, nothing in the statute requires the Commission to consider the factors in any particular order.  <u>See</u> <u>Nucor-CoRe Steel</u>, Slip Op. 08-141 at 40.  As such, the Court rejects Plaintiffs' challenge to these Commissioners' analytical framework.

## III. Likely Volume, Price Effect, And Impact On The Industry

### A.   Volume

#### 1.   Statutory framework

Pursuant to 19 U.S.C. § 1675a(a)(1), the Commission must evaluate "the likely volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked." In addition, 19 U.S.C. § 1675a(a)(2) provides:

> In evaluating the likely volume of imports of
> the subject merchandise if the order is
> revoked . . . the Commission shall consider
> whether the likely volume of imports of the
> subject merchandise would be significant if
> the order is revoked . . . either in absolute
> terms or relative to production or consumption

in the United States.  In so doing, the Commission shall consider all relevant economic factors, including –

(A)   any likely increase in production capacity or existing unused production capacity in the exporting country,

(B)   existing inventories of the subject merchandise, or likely increases in inventories,

(C)   the existence of barriers to the importation of such merchandise into countries other than the United States, and

(D)   the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products.

Put simply, the Commission must determine whether, considering the four economic factors set forth in subsections (A) through (D) of the statute, it is "likely" that the volume of imports will be "significant" if the unfair trade orders are revoked.  See id. "Thus, in accordance with the statute, in order to find sufficient volume for there to be injury, the [Commission] must identify substantial evidence from the record demonstrating that, should the orders be revoked, it is likely that the volume of the subject imports entering the U.S. market will be significant."  Nippon Steel Corp. v. United States, 29 CIT 695, 712, 391 F. Supp. 2d 1258, 1275 (2005) (citing 19 U.S.C. § 1675a(a)(2)).

In its Views, the Commission concluded that the volume of imports from the Mittal Countries would not likely be significant in the event of revocation of the orders.  See Views at 46 (PR

453). Plaintiffs contend that the Commission's volume analysis is flawed because the Commission: (1) relied on the notion that the producers from the Mittal Countries will restrain imports based on their corporate affiliation with Mittal USA; (2) made statements with regard to capacity and capacity utilization that are unsupported by record evidence; and (3) failed to adequately address the potential for market-shifting, export orientation of the producers from the Mittal Countries, and third-country markets.

## 2. ArcelorMittal's strategy

The Commission stated that:

ArcelorMittal Group's strategy for its subsidiaries and trading group is to supply home and regional markets, and not to serve export markets where the Group is a producer, and that this global marketing strategy limits the motivation of the subject producers in Kazakhstan, Romania, and South Africa to significantly increase shipments to the U.S. market . . . Mittal USA's control over the products that enter the U.S. market makes it unlikely that any of the affiliated subject producers in Kazakhstan, Romania, or South Africa will move aggressively to capture U.S. market share or sell its products in a manner that would have a negative effect on prices that Mittal USA receives.

Views at 44-45 (PR 453).

### a) Nucor's arguments

Nucor objects to the Commission's volume finding based on the Commission's past reviews. See Nucor's Mem. at 22-24. It argues that in past reviews that the ITC found that an ArcelorMittal presence in subject countries would not inhibit significant volumes of subject merchandise from re-entering the U.S. market. See id.

at 23. As such, Nucor contends the Commission made arbitrary and inconsistent determinations regarding general market dynamics without an adequate explanation. See id. at 23-24.

Reiterating its profit maximization theory discussed in detail with respect to cumulation, Nucor next argues that there is no rational economic reason why the Mittal Countries' producers will not ship significant quantities of subject merchandise upon revocation of the orders. See id. at 24. Nucor contends that they will do so to maximize total global profits.

### b) Plaintiff USS's arguments

USS makes five separate arguments against the Commission's volume determination focusing on ArcelorMittal's business strategy. See USS's Mem. at 24-31. First, USS argues that the Commission's Views do not address the argument that imports from the Mittal Countries would harm other domestic producers without harming Mittal USA. See id. at 24-26.

Second, USS disputes the Commission's statement that "the nature of the U.S. hot-rolled steel market, in which producers and importers compete in nearly all geographic markets, makes significant imports in any region of the country likely to have a disruptive impact on the overall U.S. market; thus, it is a course that Mittal USA is unlikely to pursue." Views at 45 (PR 453). USS contends that the data upon which the Commission relies do not support the Commission's finding that significant imports in any

region of the country are likely to have a disruptive impact on the overall U.S. market.  See USS's Mem. at 26-27.

Third, USS contends that even if it is true that Mittal USA would suffer by reason of imports from the Mittal Countries, the Commission failed to consider whether the harm to Mittal USA would be outweighed by the benefit to ArcelorMittal's overall operations.[16]  See id. at 27-28.  In addition, USS describes two possible scenarios under which ArcelorMittal could increase its overall profits in the U.S. even if doing so caused the U.S. prices to fall.[17]  USS argues that the Commission's failure to address

---

[16]    In support, USS cites to the separate dissenting opinion of Commissioners Lane and Pinkerton, who stated that:

> At the hearing, Mr. Schorsch, the Chief Executive Officer of Flat Carbon-Americas for Arcelor Mittal, testified that "the marketing or commercial organization" in the United States would have to consent to imports from sister companies.  We note that both Mr. Schorsch and Mittal USA failed to identify the Arcelor Mittal entity or entities that exercise influence over this "marketing or commercial organization."  It is entirely possible – indeed likely given the interests of the Arcelor Mittal Group as a whole – that the decision to export to the United States would be based upon a balancing of costs to Mittal USA against benefits to the exporting entity.

Dissenting Views at 52.

[17]    Scenario 1:  A multinational company does not engage in unfair trade, and brings no imports into this market.  It sells 3 million NT of hot-rolled steel produced at its U.S. operations for a price of $550/NT.  It makes a profit of $150/NT, or $450 million (3 million NT x $150/NT = $450 million).

Scenario 2: The same company sells 500,000 NT of hot-rolled steel at a dumped or subsidized price, causing the average

(continued...)

these points constitutes an error.

Fourth, USS points to the behavior of the Ispat organization, the predecessor of ArcelorMittal, during the original investigation as a basis for its position that the volume of subject imports from the Mittal Countries is not likely to decline. See id. at 28-30. USS explains that although Ispat owned a U.S. producer, Ispat Inland, Inc., and also owned the sole hot-rolled steel producer in Kazakhstan, Ispat Karmet (which is now Mittal Temirtau), U.S. imports from Kazakhstan increased 47.7 percent during the original period of investigation. See id. at 29. As such, Plaintiffs argue that upon revocation of the order, ArcelorMittal will similarly increase the volume of hot-rolled steel to the United States from its affiliates as Ispat did from Kazahkstan.

Fifth, USS points out that the Commission's likely volume analysis contradicts the Staff Report stating that the Mittal Countries would respond with "relatively large changes in the quantity shipped to the U.S. market." See id. at 30; see Views at

---

(...continued)

U.S. price to fall from $550/NT to $520/NT. Because the unfairly-traded goods carry a lower cost, the profit on these imports is $220/NT, or $110 million (500,000 NT x $220/NT = $110 million). The company also sells 3 million NT of hot-rolled steel from its domestic operations at $520/NT. On these sales, it makes a profit of $120/NT, or $360 million (3 million x $120/NT = $360 million). Under this scenario, therefore, the company's total profits in the U.S. market are $470 million ($110 million + $360 million = $470 million) – $20 million higher than its profits under Scenario 1 – even though prices have fallen in a manner that harms other U.S. producers.

II-11, 11-12 (PR 453).  USS contends the Commission impermissibly ignored these facts even though they were raised.  See id. at 31.

### c) Plaintiff AKS's arguments

AKS also challenges the Commission's finding on the ground that, as of 2007, Mittal USA was exporting hot-rolled steel to Western Europe notwithstanding the fact that ArcelorMittal has many production facilities in Western Europe.[18]  See AKS's Mem. at 27-28. AKS notes that some of those exports went to Belgium where ArcelorMittal is the largest producer of flat-rolled products like hot-rolled steel.  Based on these facts, AKS states that domestic producers argued before the Commission that ArcelorMittal would not hesitate to export to the United States from the Mittal Countries. The Commission, however, did not address this issue in the Views.

### d) ITC's responses

The Commission maintains that its volume finding is supported by substantial evidence.  See ITC's Mem. at 25-36.  In addition to considering all of the record evidence relating to production capacity, unused capacity, inventories, domestic and export

---

[18]    AKS makes many of the same arguments that USS puts forth against the ITC's finding that ArcelorMittal would limit imports to the United States.  See AKS's Mem. at 21-28.  Although AKS's arguments are directed to the Commission's cumulation decision rather than its volume determination, the Court finds they relate to likely volume of subject imports and are appropriately discussed in this section.  Since they are similar to USS's arguments, the Court will not recount them, but they were thoroughly considered with respect to both the Commission's cumulation and volume determinations.

shipment patterns, barriers to importation, and potential for product shifting, see id. at 25-32, the Commission states it relied on the testimony of a Mittal USA executive that Mittal USA has veto power over imports of hot-rolled steel products from the subsidiaries, see id. at 32.

In response to Plaintiffs' arguments, the ITC retorts that record evidence does not support Plaintiffs' speculative theories that the ArcelorMittal group would maximize it profits at the expense of its U.S. operations. See id. at 32-34. Based on record evidence, the Commission states that it reasonably found that ArcelorMittal would not likely disrupt Mittal USA and the U.S. market. Based on Mittal USA's own interest in maintaining a profitable U.S. market, the Commission states that it is unlikely that volume of imports from the Mittal Countries would enter in significant volumes.

In further support, the Commission states that hot-rolled steel is a price sensitive product that is sold nationally. See id. at 34. Therefore, the Commission contends that any pricing practices that would negatively impact Mittal USA's competitors are likely to also impact Mittal USA. Moreover, the ITC dismisses Plaintiffs' argument that Mittal USA will cause injury to other domestic producers while not disrupting its own business as an unsupported speculation. See id. at 35.

The ITC disputes USS's argument relating to Mittal USA's

predecessor, Ispat Inland, Inc., on the ground that there are substantial differences in facts. See id. at 35-36. Specifically, the Commission states that the current corporate relationship involves substantially more domestic and subject production than the single country relationships that existed in the original investigations. The Commission states that Ispat Inland, then accounted for a much smaller portion of domestic production, and was related to a hot-rolled steel producer in only one country, Ispat Karmet, in Kazakhstan. In contrast, Mittal USA accounts for a much larger portion of domestic production than Ispat Inland did, and is related to producers in Romania and South Africa.

### 3. Production capacity and capacity utilization

With respect to production capacity and capacity utilization, the Commission stated that:

> The production capacity for Kazakhstan, Romania, and South Africa on a cumulated basis is relatively modest and has remained relatively flat over the period of reviews, fluctuating slightly between 12 million and 13 million short tons. Capacity utilization on a cumulated basis has remained relatively stable, ranging from about 78 percent to 86 percent between 2001 and 2006.

Views at 43 (PR 453).

#### a) Plaintiffs' argument

Plaintiffs contend that the Commission's volume analysis ignored the [                          ]. See Nucor's Mem. at 25-26; USS's Mem. at 21-22. USS points to [                ] unused capacity during 2006. See USS's Mem. at 21. In comparison

to the total volume of subject imports from all ten countries in 2000, which was then 3,683,069 NT, USS argues that producers in the Mittal Countries could ship a volume of imports equal to [    ] percent of the total imports during 2000 by merely drawing upon their unused capacity.  See id. at 21-22; AKS's Mem. 16-17.

**b) ITC's response**

The Commission maintains that the production capacity for the Mittal Countries on a cumulated basis of 12 to 13 million short tons is relatively flat in fluctuation and that this production capacity is relatively modest in comparison with the 2006 U.S. production capacity of over 80 million short tons, and the production capacity of the Other Cumulated Countries of 90 to 134 million short tons (which varies depending on the source of data). See ITC's Mem. at 26. The Commission also notes that cumulated production capacity for the Mittal Countries had only slightly increased from the 11.8 million short tons reported in the original investigations whereas production capacity of the Other Cumulated Countries had almost tripled.  With respect to capacity utilization, the ITC maintains that excess capacity remained at a level similar to that during the original investigations and it remained at a relatively constant level throughout the period of review ("POR").

### 4.   Market shifting, export orientation and third-country markets

The Commission stated:

Domestic shipments of hot-rolled steel (combined internal consumption and home market) on a cumulated basis accounted for a majority of total shipments in each of the subject countries, with the share remaining at a relatively constant level (approximately two-thirds of total shipments) over the period of review.  Thus, exports as a share of total shipments and the volume of total exports have remained relatively stable.  The volume of shipment exported has increasingly been focused on customers located in markets considered regional to each of these subject countries.

Views at 43 (PR 453).

### a) Plaintiff USS's argument

USS contends that in the above discussion the Commission failed to account for the fact that the U.S. market is particularly attractive to foreign producers despite making that finding with respect to imports from the Other Cumulated Countries.[19]  See USS's Mem. at 22-23.  USS thus argues that the Commission's analysis is

---

[19]   Specifically, Plaintiffs point to the Commission's statement with respect to China, India, Indonesia, Taiwan, Thailand, and Ukraine that:

Other considerations are the attractiveness of the relatively open U.S. market and its higher prices that will serve as an incentive for producers in these subject countries to direct exports currently shipped to other markets to the U.S. market if the orders are revoked. Prices for hot-rolled steel in the United States generally are appreciably higher than those in most other markets, except those in the European Union.

Views at 34 (PR 453).

seriously undermined, and the Commission has failed to adequately address this issue in its market-shifting analysis.

Moreover, USS contends that [                    ] of exports from the Mittal Countries were shipped to [

]. See id. at 23.

### b) Plaintiff Nucor's arguments

Nucor contends that the Commission failed to discuss the fact that subject producers from the Mittal Countries exported [

] of total shipments than [

] and that they are and still remain net exporters. See Nucor's Mem. at 26-27.

Moreover, Nucor argues that "capacity increases in alternative export markets will deprive subject producers of many of their current export destinations, making it likely that they will shift subject exports to the United States upon revocation of the orders." See id. at 28.

In particular, Nucor contends that the Commission ignored the shrinking third-country export markets of subject producers from the Mittal Countries, including the potential impact of China's shift from a net-importer to a net-exporter of hot-rolled steel products on subject producers from the Mittal Countries. See id.

In addition, Nucor argues that the effect of China's shift to net-exporter status will be further exacerbated by growing capacity in other alternative export markets, which will make it more likely that subject producers from the Mittal Countries will shift exports to the United States upon revocation.  See id. at 29-30.

### c) ITC's responses

The Commission responds that it considered the record evidence regarding domestic and export shipment patterns and found that domestic shipments of hot-rolled steel on a cumulated basis accounted for a majority of total shipments in each of the subject countries.  See ITC's Mem. at 27.  In addition, it considered the export markets for each of the Mittal Countries and found that those countries increasingly focused on regional customers.  See id.  With respect to Nucor's argument regarding China and the impact of increases in Chinese production, the Commission responds that it found that there was no reason to discuss China.  See id. at 31-32.  According to the Commission, China had not been a principal let alone a major market for the subject industries, and decreases in such exports had occurred by 2005 and 2006.

### 5.  Analysis

The Commission's volume determination cannot be sustained on the grounds upon which it relies.[20]  Central to the Commission's

---

[20]    The Court considered Nucor's argument that in past reviews the ITC found that an ArcelorMittal presence in subject

(continued...)

volume determination is its finding that Mittal USA will exercise its veto power in limiting subject imports from the Mittal Countries.  In support, the Commission relies on the corporate affiliation of the ArcelorMittal companies, the investment ArcelorMittal made in acquiring Mittal USA, and the fact that the hot-rolled steel market is nationwide and sensitive to small price changes.

The evidence upon which the Commission relies may support the theory that  ArcelorMittal will seek to protect its own U.S. interest, but it does not logically result in the conclusion that Mittal USA will limit subject imports from the Mittal Countries. Indeed, evidence overwhelmingly supports the conclusion that:  (1) ArcelorMittal affiliates will do what is good for the company as a whole; (2) ArcelorMittal's overall operations would benefit from increased imports from the Mittal Countries; and, therefore; (3) Mittal USA has no incentive to exercise its veto power over imports from the Mittal Countries.

First and foremost, ArcelorMittal's affiliate companies

---

(...continued)
countries would not inhibit significant volumes of subject merchandise from re-entering the U.S. market citing Steel Concrete Reinforcing Bar from Belarus, China, Indonesia, Korea, Latvia, Moldova, Poland, and Ukraine, Invs. Nos. 731-TA-873-875, 877-880, and 882 (Review), USITC Pub. No. 3933 (July 2007)("Rebar Sunset Review").  See Nucor's Mem. at 23.  This argument does not merit a lengthy discussion.  It suffices to say, the Commission's evidentiary and logical bases for its volume finding in the Rebar Sunset Review are distinguishable from those of the subject review.

evaluate their business decisions based on what is in the best interest of ArcelorMittal's overall operations, not that of each affiliated entity.  See Views at 65-66 n.251 (CR 427)("[

].'" (emphasis added)).

Secondly, the two scenarios described by USS provide a theoretical model by which ArcelorMittal could increase its overall profits in the United States even if doing so caused U.S. prices to fall.  The Commission's own Staff Report concluded that the mills in the Mittal Countries would respond to changes in demand in the United States with "relatively large changes in the quantity shipped to the U.S. market."[21]  Views at II-11 to II-12 (PR 453). ArcelorMittal would apparently benefit from maximizing production in its low-cost facilities in Kazakhstan.  See Tr. at 222, 268-269 (PR 253).

---

[21]    The Commission did not address this critical information in their Final Determination even though it was raised by interested parties.  The Commission "may not through its silence simply ignore a Staff Report analysis that contradicts the Commission's own conclusions where an interested party has specifically brought the possibly conflicting evidence to the agency's attention."  Altx, Inc. v. United States, 25 CIT 1100, 1103, 167 F. Supp. 2d 1353, 1359-60 (2001).  If the Commission believes the information contained in the Staff Report is not contradictory to its volume determination as it asserts, see ITC's Mem. at 30, it ought to provide a cogent explanation for its belief.

In addition, by drawing upon their unused capacity, producers in the Mittal Countries are capable of shipping a volume of imports equal to [      ] percent of the total volume of subject imports during 2000.  Even "Mittal USA acknowledged that it may allow imports from its sister facilities in these subject countries to enter the U.S. market."[22]  Views at 44 (PR 453).  Thus, clearly, if harm to Mittal USA by way of subject imports from its affiliates would be outweighed by the benefit to ArcelorMittal's overall operations, then Mittal USA would have no incentive to exercise its veto power over imports from the Mittal Countries.[23]

The Commission's volume finding is also flawed with respect to its finding that "significant imports in any region of the country [are] likely to have a disruptive impact on the overall U.S. market" suggesting that any pricing practice that would negatively impact Mittal USA's competitors is likely to also impact Mittal

---

[22]     The Commission responds that it considered this argument, but relied upon the testimony that such imports from Mittal USA's sister facilities would be "'managed in such a way and controlled . . . by the domestic marketing organization, which obviously has the interest of protecting . . . that production base in that domestic market.'"  ITC's Mem. at 33. This testimony merely states that Mittal USA would protect its own domestic production base.  It, however, does not provide a reasoned basis for the Commission's belief that Mittal USA would not disrupt the U.S. market or harm the other domestic producers.

[23]     Indeed, in 2006, ArcelorMittal's affiliates collectively imported a total of [      ] of reported total U.S. imports.  See Final Staff Report at Table I-16 (CR 376).  One of those affiliates was [          ] importer of steel into the U.S.  See id.

USA.  Views at 45 (PR 453).  The only data upon which the Commission cites to support its findings is a chart listing producers and importers by region.  See Views at Table II-1 (PR 453).  This data, however, do not provide an adequate basis for the Commission's finding that regional surges in subject imports are likely to have a national effect or lead to the conclusion that any negative price impact on Mittal USA's competitors would also negatively impact Mittal USA.[24]  The Commission's finding even contradicts the admission of an executive of ArcelorMittal that its imports "may affect competitors in this market who are in different geographies or serve different market segments, and so on."  Tr. at 219 (PR 253).  Indeed, ArcelorMittal's U.S. mills are located in the East and Midwest, which would enable ArcelorMittal to steer imports away from direct competition with Mittal USA.  See Views at Table I-14 (PR 453).  Accordingly, the Court cannot sustain the Commission's findings without a reasoned basis for its belief that significant imports in any region of the country are likely to have a disruptive impact on the overall U.S. market.

The Commission's volume determination also cannot be sustained based on its inadequate explanation of the behavior of

---

[24]    The Court disagrees with the Commission's contention that "the nationwide effect on domestic prices of additional supplies of hot-rolled steel [] was a theory proposed by Domestic Producers."  ITC's Mem. at 23.  The testimony upon which the Commission relies simply does not support the Commission's position.  See Tr. at 267-268 (PR 253).

ArcelorMittal and its predecessor.  Evidence reflects that U.S. imports from Kazakhstan increased from 130,329 short tons in 1998 to 192,470 short tons in 2000, an increase of 47.7 percent, while Ispat organization, the predecessor of ArcelorMittal, owned a U.S. producer, Ispat Inland, Inc., and the sole hot-rolled steel producer in Kazakhstan, Ispat Karmet.[25]    See Views at I-8 (PR 453).  As Plaintiffs point out, this fact supports the theory that upon revocation of the order, ArcelorMittal will similarly increase the volume of hot-rolled steel to the United States from its affiliates as Ispat did from Kazahkstan.  Moreover, as of 2007, Mittal USA was exporting hot-rolled steel to Western Europe notwithstanding the fact that ArcelorMittal has many production facilities in Western Europe.  See Post-Hearing Brief of USS at 12 (PR 328).  The record further reflects that some of those exports went to Belgium where ArcelorMittal is the largest producer of flat-rolled products like hot-rolled steel.

The Commission responds that ArcelorMittal's multinational operations involve substantially more domestic and subject production than those single country relationships that were in place in the original investigations.  This explanation is woefully inadequate.  Views at 45 (PR 453).  The fact that ArcelorMittal is related to steel producers in more than one country and accounts for a larger portion of domestic production as compared to Ispat

---

[25]    Ispat Karmet is now Mittal Temirtau.

Inland does not sufficiently explain why ArcelorMittal would be compelled to restrain its volume of imports from the Mittal Countries especially in light of ArcelorMittal and its predecessor's apparent business practices.

The Commission's volume determination is also flawed to the extent it failed to address certain key evidence on the record. "'[A] reviewing court is not barred from setting aside [an agency] decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [agency's] view.'" Timkin Co. v. United States, 27 CIT 605, 621, 264 F. Supp. 2d 1264, 1278 (2003) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

Specifically, the Commission failed to discuss evidence opposed to the ITC's volume determination, including [

] and export orientation of the Mittal Countries' producers, attractiveness of the U.S. market, and capacity increases in alternative export markets.

The Commission's analysis of production capacity fails to account for the fact that in 2006, the Mittal Countries, on a cumulated basis, had [          ] short tons of [            ], which accounts for nearly [        ] the amount that sufficed for material injury in the original investigation. See Final Staff Report at Tables IV-31, IV-35, IV-40 (CR 376). This fact is

significant since it means that producers in the Mittal Countries could, by drawing upon their unused capacity, ship a volume of imports equal to a large portion of the total imports during 2000.

With respect to the export orientation of the subject producers of the Mittal Countries, the Commission did not address the fact that: (1) from 2000 to 2006, Romanian exports [    ] from [    ] percent to [    ] percent, see Final Staff Report at Table IV-34 (CR 376); (2) in 2006, Romania produced [        ] short tons of hot-rolled steel for sale on the open market[26] and exported [        ] short tons, meaning that it exported [    ] percent of commercial shipments, see id. at Table IV-35; (3) during the POR, South African exports as a share of total shipments ranged from [                    ], and in 2006, its volume of total exports was [      ] short tons, see id. at Table IV-40; (4) in 2006, Kazakhstan produced [        ] short tons of hot-rolled steel for sale on the open market[27] and exported [        ] short tons, meaning that it exported [    ] percent of commercial shipments, see id. at Table IV-31; and (5) during the POR, Kazakh exports as a share of total shipments ranged from [

], see id. at Table IV-31.  Thus, the record indicates that subject producers in the Mittal Countries exported [

---

[26]    This figure equals the quantity of production less the quantity of internal consumption for Romania.

[27]    This figure equals the quantity of production less the quantity of internal consumption for Kazakhstan.

] of total shipments than [

], which suggests that significant volumes of imports could enter the U.S. market.  See Views at 20, n. 69 (CR 427).

The Commission also makes no mention of the attractiveness of the U.S. market to the industries in the Mittal Countries despite finding it an important factor with respect to the imports from the Other Cumulated Countries.  The fact that the U.S. market is particularly attractive to foreign producers due to the relatively open U.S. market and its higher prices serves as an incentive for the producers of the Mittal Countries as well as those of the Other Cumulated Countries to direct shipments to the U.S. market if the orders are revoked.  See id. at 2-23.  If the Commission believes that is not the case, it should provide an adequate basis for its belief.

In addition, the Commission ignores capacity increases in alternative export markets, which will deprive subject producers of their current export destinations making it likely that they will shift subject exports to the United States upon revocation of the orders.  Specifically, the Commission did not address the potential impact of China's shift from a net-importer to a net-exporter of hot-rolled steel products on subject producers from Mittal Countries.  The Commission's response that there was no reason to discuss China is a post hoc rationalization.  See ITC's Mem. at 31.

The Commission relied upon the "China effect" to support its affirmative determination for the Other Cumulated Countries. At minimum, the Commission should explain why China is irrelevant with respect to the Mittal Countries.

The Commission's volume determination and its subsidiary findings, in view of the record as a whole, are not substantially supported or explained, especially in light of the Commission's reliance of its flawed belief that Mittal USA would exercise its veto power to limit imports from the Mittal Countries. See Usinor v. United States, 26 CIT 767, 784 (July 19, 2002) ("'When considered individually, every discrepancy discussed here might not rise to the level of requiring reconsideration of the overall disposition, but taken as a whole, the court finds that the ITC decision is not substantially supported and explained.'"). Moreover, "[w]hile the ITC need not address every argument and piece of evidence . . . it must address significant arguments and evidence which seriously undermine its reasoning and conclusions." Altx, 25 CIT at 1117-18, 167 F. Supp. 2d at 1374.

Accordingly, on remand, the Commission must: (1) reevaluate its flawed reasoning for the finding that ArcelorMittal companies and/or Mittal USA would limit subject imports from the Mittal Countries; (2) reassess and further explain the basis for its findings that significant imports in any region of the country are likely to have a disruptive impact on the overall U.S. market, and

that any pricing practices that would negatively impact Mittal USA's competitors is likely to also impact Mittal USA; (3) reassess and further explain the behavior of ArcelorMittal and its predecessor, the Ispat organization, with respect to their business practices in exporting to countries in which they maintain production facilities; and (4) reassess and further explain evidence opposed to the ITC's volume determination, including [          ], export orientation of the Mittal Countries' producers, attractiveness of the U.S. market, and capacity increases in alternative export markets.

**B.    Price Effects**

The Commission found that revocation of the orders would not be likely to lead to significant underselling or significant price depression or suppression within a reasonably foreseeable time. See Views at 46 (PR 453). In so doing, the Commission relied on its volume determination.

**1.    Plaintiff USS's argument**

USS argues that subject producers from the Mittal Countries will engage in significant underselling. See USS's Mem. at 31-33. Relying on the record from the original investigations, USS states that Kazakh imports undersold the domestic like product in 6 of 6 pricing comparisons, Romanian imports undersold the domestic like product in 37 of 43 comparisons, and South African imports

undersold the domestic like product in 10 of 19 instances.[28]   In
addition, USS points to the Commission's finding with respect to
subject imports from the Other Cumulated Countries that low-priced
imports will generally force domestic hot-rolled steel producers to
either lower prices or lose sale, and argues that low-priced
imports from the Mittal Countries would have the same effect.

## 2.   **Plaintiff Nucor's arguments**

Nucor argues that the Commission's price effects finding is
unsupported by substantial evidence because it relies on faulty
volume and conditions of competition analysis. See Nucor's Mem. at
30-32.  Nucor's other arguments are substantially similar to USS's
arguments, and the Court will not recount them in detail.

## 3.   **ITC's responses**

The ITC responds that the Commission considered the fact that
in the original investigations imports from the Mittal Countries
undersold the domestic like product in a majority of price
comparisons and considered the limited pricing data in these
reviews. See ITC's Mem. at 36-38.  The Commission states it did
not rely on the data from the original investigation due to the
substantial changes in conditions of competition including Mittal
USA's increased role in the U.S. market as compared to its

---

[28]   In these reviews, the pricing data were limited.  The
most recent price comparison available were for 2003, which
included no price comparisons for Kazakhstan, 13 comparisons for
Romania and 8 comparisons for South Africa. See Views at 46, n.
269 (PR 453).

predecessor and its affiliation with producers in the Mittal Countries. With respect to the pricing comparison data from these reviews, the Commission states that it was reasonable not to rely on such limited data. In sum, the ITC responds that it rejected domestic producers' theories and reasonably found from the record evidence that Mittal USA has no incentive to allow subject imports from the Mittal Countries to be priced aggressively so as to move large volumes of hot-rolled steel at low prices into the U.S. market.

## 4. Analysis

Having found that the Commission's volume determination is unsupported by substantial evidence, the Court finds that the Commission's conclusion that revocation of the orders would not lead to adverse price effects is similarly unsupported by substantial evidence. On remand, the Commission must reassess the potential price effects in accordance with its revised volume determination.

## C. Likely Impact

In its Views, the Commission did not find the domestic industry vulnerable. Considering its volume finding, price effects and conditions of competition, the Commission concluded that revocation of the orders on imports from the Mittal Countries is not likely to lead to a significant adverse impact on the domestic

industry within a reasonably foreseeable time.  See Views at 47 (PR 453).

### 1.  Plaintiff USS's argument

USS argues that the Commission's impact finding is not supported by substantial evidence to the extent it rests on the Commission's volume and price effects findings.  See USS's Mem. at 33-34.  Moreover, it contends that the Commission's likely impact finding cannot rely solely on its finding that domestic industry is not vulnerable to material injury.

### 2.  Plaintiff Nucor's argument

Similarly, Nucor argues that the Commission's impact finding cannot be sustained because it is premised on faulty volume, price effects and conditions of competition analysis.  See Nucor's Mem. at 32-35.  Specifically, Nucor states that the Commission, in its affirmative impact determination for imports from the Other Cumulated Countries, also found that the domestic industry is not vulnerable to material injury.  See id. at 33.  Nevertheless, the Commission, taking note that the domestic industry performed poorly in the latter portion of the POR, stated that this performance would further deteriorate if subject imports re-entered the U.S. market exacerbating the declines in production, shipments, market share, and financial performance.  See id. at 34.

Nucor argues that the likely volume and price effects of imports from the Mittal Countries will also exacerbate declines in

the domestic industry's production and financial performance because imports from the Mittal Countries will likely be diverted to the United States upon revocation of the orders. See id. at 34-35. Thus, according to Nucor, the poor financial performance of the domestic industry in the latter portion of the POR applies equally to an analysis of subject imports from the Mittal Countries as it does to imports from the Other Cumulated Countries.

### 3. ITC's response

The Commission states that Plaintiffs primarily rely on the Commission's volume and price effects findings in their attacks on the Commission's impact finding. See ITC's Mem. at 38. Because the Commission's volume and price effects findings are supported by substantial evidence, it contends that the impact finding should be affirmed.

### 4. Analysis

Having found that the Commission's volume and price effects determinations are unsupported by substantial evidence, the Court finds that the Commission's likely impact analysis is similarly unsupported by substantial evidence to the extent it relies on the faulty volume finding. On remand, the Commission must reassess its likely impact analysis in accordance with its revised volume and price effects determinations. In addition, the Commission must account for and explain the poor performance of the domestic industry in the latter portion of the POR.

**CONCLUSION**

In accordance with the foregoing, the Court remands the ITC's final determination.  Plaintiffs' motion for judgment upon the agency record is granted in part and denied in part.


                                    /s/ Nicholas Tsoucalas
                                 **NICHOLAS TSOUCALAS**
                                     **SENIOR JUDGE**


Dated:     March 9, 2009
           New York, New York

**ERRATUM**

<u>Nucor Corp. v. United States</u>, Consol. Court No. 07-00454, Slip Op. 09-16, dated March 9, 2009.

Page 29, footnote 16, Line 2:  "Pinkerton" should read "Pinkert"

March 24, 2009